# United States Court of Appeals

### For the Eighth Circuit

_____

No. 13-3326
_____

Thomas F. Kuduk

*Plaintiff - Appellant*

v.

BNSF Railway Company

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: June 12, 2014
Filed: October 7, 2014

_____

Before LOKEN, BRIGHT, and GRUENDER, Circuit Judges.

_____

LOKEN, Circuit Judge.

The Federal Rail Safety Act ("FRSA") prohibits rail carriers from retaliating against employees who engage in safety-related protected activities. 49 U.S.C. § 20109(a). Brakeman Thomas Kuduk, a long-time employee of BNSF Railway Co. ("BNSF"), commenced this action alleging that BNSF violated this anti-retaliation mandate when it terminated him in September 2010. He now appeals the district

court's[1] grant of summary judgment dismissing his FRSA claim. Reviewing the court's decision *de novo* and the facts in the light most favorable to Kuduk, we affirm.

**I.**

After a long history of good work performance, Kuduk committed a Level S (Serious) safety violation in December 2009. He accepted responsibility for causing a car to derail and agreed to discipline consisting of a 30-day record suspension and one year of probation. The Investigation Waiver provided that "[a]ny rules violation during this probation period could result in further disciplinary action." BNSF's Policy for Employee Performance Accountability provided that "Dismiss[i]ble Violations" include two serious rule violations within a twelve-month review period for an employee with a good safety and discipline record.

On June 9, 2010, two supervisors, Trainmaster Greg Jaeb and Larry Mattison, observed Kuduk walking between the rails of Track 190 near Hinckley, Minnesota. Walking between the rails, or "fouling the tracks" as it is called in the industry, is permitted only in limited situations. BNSF's Train Yard & Engine Safety Rules, echoing the requirements of 49 C.F.R. § 214.313(b)-(c), instruct: "Do not walk between rails or foul the track, except when duties require and proper protection is provided." Violating this rule is a well-recognized serious safety violation. BNSF designates it one of the "Eight Deadly Decisions" and a Level S violation.

Mattison and Jaeb reported the violation, and an investigation ensued, with the union representing Kuduk. After Kuduk rejected a negotiated settlement, a formal hearing before the Superintendent of Operating Practices for the Twin Cities Division took place on September 8, 2010. Kuduk testified that he was walking between the

---

[1]The Honorable Michael J. Davis, Chief Judge of the United States District Court for the District of Minnesota.

rails to retrieve and re-attach a rear end device, a task included in his job duties as a brakeman. He contended that he was required to walk on the track because the Training Coordinator's Manual required him to "always take the safe course" and walking on the ballast alongside the track was unsafe due to uneven terrain. He argued his movements were protected because he lined nearby tracks and applied handbrakes to train cars in the vicinity. Jaeb and Mattison testified that they did not see Kuduk performing any work duty, and that he complained about walking conditions on the ballast, apologized for walking on the track, and asked for leniency.

The hearing transcript and exhibits were provided to Richard Ebel, General Manager of BNSF's Twin Cities Division. Ebel reviewed the evidence and Kuduk's personnel record, including the December 2009 S-Level violation, and determined that dismissal was appropriate after consulting with Jim Hurlburt from BNSF labor relations. The discharge was approved by regional vice president Sanford Sexhus. Kuduk was dismissed on September 17. After the discharge, the union and BNSF continued negotiations, eventually agreeing that Kuduk would be "available for service" and receive agreed employee benefits through June of 2011 and would retire thereafter with full benefits.

## II.

The FRSA provides that a rail carrier "may not discharge . . . or in any other way discriminate" against an employee because he lawfully and in good faith provided information relating to, or directly assisted investigation of, conduct the employee reasonably believed violated a Federal law relating to railroad safety, or for "reporting, in good faith, a hazardous safety or security condition." 49 U.S.C. §§ 20109(a)(1) and (b)(1)(A). The statute provides that an employee may obtain *de*

*novo* review of a retaliation claim in federal court after exhausting administrative remedies. § 20109(d)(3).[2]

In March, 2011, Kuduk filed a complaint with the Department of Labor alleging that his discharge was motivated, at least in part, by two complaints he made in the months preceding discharge that constituted safety reports protected by the FRSA. First, he complained to union representative Mike Wold, a member of BNSF's safety committee, that Trainmaster Jaeb unfairly conducted a "banner test" on May 17, 2010. A banner test ensures that trains are able to stop within the range required by the General Code of Operating Rules. During a banner test, the examiner waves a flag and the crew must bring the train to a complete stop within a certain distance. Kuduk's crew passed the test, but Kuduk objected that Jaeb had not fully unfurled the flag. Wold raised Kuduk's concern at a May 19 safety committee meeting; the committee concluded the test was fine because "any object waved violently is a sign to stop." Ebel was present at this meeting.

Second, on May 24, 2010, invoking BNSF's Safety Issue Resolution Process ("SIRP"), Kuduk complained that a flop-over handle used to derail cars was too heavy and could cause employee back injuries; he suggested the handle be replaced. Assigned to investigate the issue, Jaeb concluded that the handle met safety requirements and that BNSF was not responsible for the equipment because it was on the property of the railroad's customer. The SIRP inquiry was closed on September 21, four days after Kuduk's discharge.

When the Department of Labor did not issue a final decision within 210 days after Kuduk filed his complaint, he commenced this action. To prevail, he must establish a prima facie case by showing (i) he engaged in a protected activity; (ii)

---

[2]See generally Procedures for the Handling of Retaliation Complaints under the Federal Railroad Safety Act, 75 Fed. Reg. 53,522, 53,524 (Aug. 31, 2010).

BNSF knew or suspected, actually or constructively, that he engaged in the protected activity; (iii) he suffered an adverse action; and (iv) the circumstances raise an inference that the protected activity was a contributing factor in the adverse action. See 49 U.S.C. § 42121(b)(2)(B)(i); 29 C.F.R. § 1982.104(e)(2).  If Kuduk makes this showing, BNSF is nonetheless not liable if it "demonstrates, by clear and convincing evidence, that [it] would have taken the same unfavorable personnel action in the absence of [Kuduk's protected activity]."  § 42121(b)(2)(B)(ii).

## III.

The district court granted BNSF's motion for summary judgment, concluding that Kuduk failed to present a prima facie case of unlawful retaliation and, alternatively, that BNSF has shown by clear and convincing evidence that it would have discharged Kuduk even in the absence of protected activity.  Kuduk v. BNSF Ry., 980 F. Supp. 2d 1092, 1102 (D. Minn. 2013).  Kuduk appeals both rulings.

**A. Kuduk's Prima Facie Case.**  In concluding Kuduk failed to present a prima facie case, the district court first ruled that his report to union representative Wold concerning the banner test was not protected activity because Wold was not a "person with supervisory authority over the employee or [a] person who has the authority to investigate, discover, or terminate the misconduct," 49 U.S.C. § 20109(a)(1)(C). Kuduk, 980 F. Supp. 2d at 1099.  On appeal, Kuduk attacks this ruling on two distinct grounds. We conclude that we need not consider these issues because we agree with BNSF that Kuduk's complaint to a union representative that Trainmaster Jaeb had unfairly conducted the banner test was not a report of a hazardous safety condition. Kuduk himself testified that his objection to the test was that it was inappropriately and unfairly conducted, not that the way Jaeb conducted the test created a hazardous safety condition.

The district court next ruled that Kuduk's report of an overweight derail handle presented an issue of fact as to whether he had engaged in an activity protected by § 20109(b)(1)(A). 980 F. Supp. 2d at 1099-1100.[3] Though BNSF argues to the contrary on appeal, the summary judgment record supports this ruling. Kuduk testified that he made the report because he "was concerned that someone could hurt their back in trying to lift [the handle]," and the SIRP records would permit a reasonable jury to find that BNSF understood Kuduk's complaint regarding the handle to be, at bottom, a safety report.

However, the district court concluded, Kuduk failed to establish a prima facie case of unlawful retaliation under the FRSA for two reasons: (1) he "submitted no evidence that Ebel or anyone in higher management that reviewed the dismissal decision had actual or constructive knowledge of Plaintiff's protected activity"; and (2) he made no showing that his protected activity was a contributing factor in BNSF's decision to discharge him. 980 F. Supp. 2d at 1100-01. The court explained: "BNSF has given a consistent basis for its decision to terminate Plaintiff's employment, and . . . Plaintiff can point to no evidence of pretext, shifting explanations, antagonism or hostility toward Plaintiff's protected activity, or a change in attitude toward Plaintiff after he engaged in protected activity." Id. at 1101.

On appeal, as in the district court, Kuduk argues that he satisfied these requirements of a prima facie case because a reasonable jury could find that (i) Trainmaster Jaeb, a "lower-level supervisor," knew of the protected activity and acted as a "cat's paw" in the discharge process, and (ii) Kuduk's protected activity was a "contributing factor" in his discharge "because serious questions exist as to whether Kuduk in fact committed the [fouling-the-track] violation Jaeb alleged."

---

[3]Neither of the incidents Kuduk identifies constituted protected activities under § 20109(a)(1) as Kuduk has not identified "any Federal law, rule, or regulation related to railroad safety or security" that he reasonably believed to be implicated by his complaints about the banner test or the derail handle.

"The term 'cat's paw' drives from a fable conceived by Aesop . . . . In the fable, a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing." Staub v. Proctor Hosp., 131 S. Ct. 1186, 1190 n.1 (2011). In Staub, the Supreme Court held that "if a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable." Id. at 1194 (emphasis in original).

The cat's paw theory articulated in Staub is consistent with the regulation stating that the FRSA knowledge requirement may be satisfied by circumstantial evidence the employer had actual *or* constructive knowledge of protected activity. See 29 C.F.R. § 1982.104(e)(2)(ii). But Kuduk urges us to apply Staub more broadly. Relying on the Third Circuit's decision in Araujo v. N.J. Transit Rail Ops., Inc., Kuduk argues that he "need not demonstrate the existence of a retaliatory motive on the part of the employee taking the alleged prohibited personnel action in order to establish that his [protected activity] was a contributing factor to the personnel action." 708 F.3d 152, 158 (3d Cir. 2013); accord Rudolph v. Nat'l R.R. Passenger Corp., ARB No. 11-037, 2013 WL 1647527, *11-12 (Admin. Rev. Bd. Mar. 29, 2013). Therefore, Kuduk argues, Jaeb's knowledge of the SIRP report, together with Kuduk's testimony that he did not in fact violate one of BNSF's "eight deadly decisions," established without more a prima facie case. We disagree.

The FRSA provides that a rail carrier may not discharge "or in any other way *discriminate* against" an employee for engaging in protected activity. 49 U.S.C. § 20109(a). As the Court explained in Staub, the essence of this intentional tort is "discriminatory animus." 131 S. Ct. at 1193. We agree with the Ninth Circuit that, under the statute's "contributing factor" causation standard, "[a] prima facie case does not require that the employee conclusively demonstrate the employer's retaliatory

motive." Coppinger-Martin v. Solis, 627 F.3d 745, 750 (9th Cir. 2010); see Lockheed Martin Corp. v. Admin. Rev. Bd., 717 F.3d 1121, 1137 (10th Cir. 2013) (noting that contributing factor is a "more lenient" causation standard). But the contributing factor that an employee must prove is intentional retaliation prompted by the employee engaging in protected activity. See Consol. Rail Corp. v. U.S. Dep't of Labor, No. 13-3740, 2014 WL 2198410, at *3 (6th Cir. May 28, 2014) (unpublished) (concluding there was "substantial evidence that animus was a contributing factor in Bailey's termination"); Ameristar Airways, Inc. v. U.S. Dep't of Labor, 650 F.3d 562, 569-70 (5th Cir. 2011).[4]

In this case, Ebel and the other discharge decision-makers had no knowledge -- actual or constructive -- of Kuduk's protected activity, submitting an SIRP report regarding the derail handle. There is no evidence Jaeb advised the decision-makers of Kuduk's report, or that they were otherwise aware of the unrelated report. There is no evidence that Jaeb reacted negatively to Kuduk's report about the derail handle -- or to Kuduk's earlier complaint that Jaeb unfairly conducted the banner test -- and no evidence that Jaeb communicated his knowledge of Kuduk's safety concerns to the decision-makers in a manner that might have influenced their discharge decision.

Jaeb's participation in the decision-making process was limited to testifying at the formal hearing regarding the fouling-the-tracks incident. Though Kuduk argues that Jaeb would not have sought to enforce the fouling-the-track rule absent Kuduk's SIRP report, he points to no evidence that Jaeb's actions on June 9, or his later testimony at the September hearing, were in any way related to the protected activity. To the contrary, Jaeb testified that he and Mattison observed an unidentified employee fouling the tracks on June 9; only after they parked their truck, walked toward the

---

[4]In our view, the Araujo panel may have improperly relied on Marano v. Dep't of Justice, 2 F.3d 1137 (Fed. Cir. 1993), for its no-need-to-show-motive conclusion because the court in Marano was construing a federal employee whistleblower statute that required only an ultimate showing of causation in fact ("because of"), not discrimination. Id. at 1139-41.

employee, and ordered him off the tracks did Jaeb realize the employee was Kuduk. Mattison's account of these events was consistent with Jaeb's, and Kuduk's testimony was not to the contrary.

Turning to the other element of a prima facie case, a contributing factor is "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." Procedures for the Handling of Retaliation Complaints under the Federal Railroad Safety Act, 75 Fed. Reg. at 53,524.

Kuduk argues that the temporal proximity of his May 24 SIRP report, the June 9 incident when Jaeb and Mattison accused him of fouling the tracks, and his September 17 discharge made a sufficient prima facie showing that the protected activity was a contributing factor in his discharge. However, we have consistently held that "more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation." Hervey v. Cnty. of Koochiching, 527 F.3d 711, 723 (8th Cir. 2008), cert. denied, 555 U.S. 1137 (2009); Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir.) (en banc), cert. denied, 528 U.S. 818 (1999). This is especially true when the employer was "concerned about a problem before the employee engaged in the protected activity." Hervey, 527 F.3d at 723 (quotation omitted). Here, Kuduk was on disciplinary probation as a result of the 2009 derail incident; this "undercuts the significance of the temporal proximity." Id. (quotation omitted). We acknowledge that the more lenient "contributing factor" causation standard will increase to some extent the probative value of temporal proximity. See 29 C.F.R. § 1979.104(b)(2) ("*Normally*, the [contributing factor] burden is satisfied . . . if the complaint shows that the adverse personnel action took place shortly after the protected activity") (emphasis added). But we reject the notion -- suggested in some ARB decisions -- that temporal proximity, without more, is sufficient to establish a prima facie case.

In this case, it is particularly significant at the summary judgment stage that Kuduk's protected activity, though close in time, was completely unrelated to the fouling-the-tracks incident that led to his discharge. The facts surrounding Kuduk's SIRP report shared no nexus with the later fouling-the-tracks incident. Rather, Kuduk's fouling of the tracks on June 9 was an intervening event that *independently* justified adverse disciplinary action. Kuduk argues that "serious questions exist as to whether [he] in fact committed the rule violation Jaeb alleged," in essence, that BNSF misapplied the fouling-the-track rule and thus wrongfully discharged him. However, "federal courts do not sit as a super-personnel department that re-examines" an employer's disciplinary decisions. Kipp v. Mo. Highway & Transp. Comm'n, 280 F.3d 893, 898 (8th Cir. 2002) (quotation omitted). In the absence of evidence connecting his protected activity to the discharge, Kuduk is not entitled to FRSA anti-retaliation relief even if BNSF inaccurately concluded that he committed one of the Eight Deadly Decisions by fouling the tracks. See Allen v. City of Pocahontas, 340 F.3d 551, 558 n.6 (8th Cir. 2003) ("it is not unlawful for a company to make employment decisions based upon erroneous information and evaluations"), cert. denied, 540 U.S. 1182 (2004).

For these reasons, we agree with the district court that Kuduk's FRSA claim fails because he failed to present a prima facie case of unlawful retaliation.

**B.  BNSF's Affirmative Defense.**  We also agree with the district court that BNSF was not liable for wrongful retaliation because it demonstrated by clear and convincing evidence that it would have discharged Kuduk even if he had not engaged in protected activity. See 49 U.S.C. § 42121(b)(2)(B)(ii). BNSF and the union thoroughly investigated the report by Jaeb and Mattison that Kuduk had fouled the tracks on June 9. BNSF then conducted a formal hearing at which Kuduk presented testimony and witnesses; referred the evidence to a disinterested General Manager who then had his decision approved by others in senior management; allowed Kuduk

to appeal the decision; and continued to negotiate an appropriate final resolution with the union after the discharge.

The waiver Kuduk signed after his December 2009 rules violation warned that additional incidents might result in discharge. BNSF's Policy stated that a second serious incident within twelve months was a dismissible violation. BNSF presented uncontroverted evidence that it consistently enforced this policy, including records showing that, within six months of Kuduk's discharge, it discharged two other Twin Cities Division employees who had committed a second serious safety violation while on disciplinary probation. One employee had fouled the tracks while on probation, the same infraction for which Kuduk was discharged.

In these circumstances, though this affirmative defense is often not suitable for summary judgment determination, we agree with the district court that BNSF submitted clear and convincing evidence that it would have discharged Kuduk whether or not he had made unrelated reports that were activity protected by the FRSA. Kuduk argues that BNSF failed to meet its burden because whether he actually violated the TY&E Rule is a disputed fact. But he points to no evidence suggesting that BNSF's decision-making process, even if flawed, would have come out differently in the absence of Kuduk's SIRP report. Cf. Allen, 340 F.3d at 558 n.6.

The judgment of the district court is affirmed.

_____