# United States Court of Appeals

### For the Eighth Circuit

_____

No. 15-3192

_____

Edward Blackorby

*Plaintiff - Appellee*

v.

BNSF Railway Company

*Defendant - Appellant*

------------------------------

Secretary of Labor

*Amicus on Behalf of Appellee*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: September 21, 2016
Filed: February 27, 2017

_____

Before COLLOTON, MELLOY, and SHEPHERD, Circuit Judges.

_____

MELLOY, Circuit Judge.

BNSF Railway Company ("BNSF") disciplined its employee, Edward Blackorby, for not promptly reporting a workplace injury. Blackorby sued, claiming BNSF's discipline violated the employee-protections provision of the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20109(a)(4). The case went before a jury, and after the close of evidence, the jury was instructed that Blackorby need not establish intentional retaliation to prevail on his claim. The jury found for Blackorby and awarded him damages for emotional distress. Because we conclude that this Court's decision in Kuduk v. BNSF Railway Co., 768 F.3d 786 (8th Cir. 2014), required Blackorby to establish intentional retaliation and that the jury instructions did not compel such a finding, we reverse and remand.

I.

Blackorby worked on a traveling steel gang that repaired and maintained track for BNSF. While working on a dusty, windy day, Blackorby began to experience discomfort in his right eye. After work, Blackorby told a union foreman that he thought something had entered his eye, and the foreman recommended saline drops. The drops soothed Blackorby's eye, but it still felt "scratchy." Two days after the discomfort began, Blackorby had an unrelated root canal, the dentist gave him pain pills, and he went home to bed. But when Blackorby woke up on the third day, he noticed his eye had begun to swell. And by the fourth day, a Sunday, Blackorby's eye had significantly worsened. He went to the only place he thought an eye doctor would be available on a Sunday: a mall LensCrafters. There, a doctor removed a small metallic object from the surface of Blackorby's cornea.

Under Rule 1.2.5 of BNSF's Maintenance of Way Operating Rules, "[a]ll cases of personal injury, while on duty or on company property, must be immediately reported to the proper manager and the prescribed form completed." The rule further provides that "[i]f an employee receives a medical diagnosis of occupational illness, the employee must report it immediately to the proper manager."

Accordingly, Blackorby called Assistant Roadmaster Douglas Turney, a BNSF manager, immediately after the doctor removed the object from his eye. Blackorby told Turney that an object entered his eye at work, that a doctor removed the object, and that he had a follow-up appointment with the doctor the next day. Turney then relayed this information to James Sadler, also a BNSF manager. Sadler asked to accompany Blackorby to his follow-up appointment. Blackorby called his union representative, and the representative said it would be fine if Sadler went to the doctor's appointment so long as Sadler did not go into the examining room or ask for Blackorby's records. As a result, Blackorby acquiesced to Sadler's request, but he did not "feel comfortable" with Sadler coming to his appointment.

The next day, Blackorby went to his follow-up appointment and learned that his eye would be okay. After receiving the good news, Blackorby walked out to the lobby of the LensCrafters where Sadler was waiting. According to Blackorby, Sadler asked him if he wanted to formally report the injury. Blackorby said he did want to report the injury, but Sadler "was kind of adamant on [Blackorby] not reporting it." Sadler told him that Blackorby "didn't have to say it happened at work," and that he "could say it happened at home or . . . say it happened somewhere else if [Blackorby] felt comfortable with that." Blackorby asked whether he would "have to go through an investigation" if he reported the injury. Sadler said that he "hated investigations, [and] he'd rather not have them." Nevertheless, Sadler said "it was up to [Blackorby]" to decide whether to formally report the injury.

Blackorby "was pretty upset" about the conversation with Sadler and called Turney to make clear that he wanted to file a formal injury report. Although Turney already knew about Blackorby's injury, Blackorby felt the need to make the phone call because he "didn't know what [Sadler's] intention was." During this phone call, Turney told Blackorby that it would be "late reporting" if Blackorby reported the injury. Blackorby felt like Turney and Sadler "were discouraging [him] from reporting."

Six days after Blackorby first began experiencing discomfort in his eye, he filed his formal injury report. Soon after, Blackorby received a letter informing him that he was being investigated by BNSF. He "wasn't too happy" about the letter. He did not think his injury was reported late because he had immediately told Turney about the injury after the doctor discovered the metal in his eye. According to Blackorby, he would have reported the injury the day he began experiencing discomfort if he had known at the time he had metal in his eye.

After an investigation and hearing, Sadler determined that Blackorby had violated Rule 1.2.5. Accordingly, Blackorby received a Level S (Serious), 30-Day Record Suspension and a one-year probationary period. The effect of this discipline was that Blackorby faced a 30-day suspension without pay if he committed another rule violation during the one-year probationary period.

Blackorby did not ultimately receive any time off without pay as a result of his Record Suspension. In the meantime, however, Blackorby appealed the discipline within BNSF. Blackorby then filed a complaint with the Occupational Health and Safety Administration, which issued findings that BNSF violated Blackorby's rights under the FRSA. These findings were challenged before an administrative law judge, but while the challenge was still pending, Blackorby filed the present action in federal district court for de novo review pursuant to 49 U.S.C. § 20109(d)(3).

The facts detailed above were presented to a jury through evidence and testimony. At trial, Sadler testified that Blackorby could not have been disciplined under Rule 1.2.5 had Blackorby not filed the injury report. BNSF, moreover, stipulated that "management/personnel[ ] may earn bonuses based in part on the rates and/or occurrence of employee injuries." Blackorby also testified of the worry and stress he experienced during the year-long probationary period. He stated, "[I]t was pretty upsetting because you know you can't mess up. I mean, when that's on your

record, something major could actually end your career, and you ain't going to go out and get another railroad job. It ain't going to happen."

After the close of evidence, the district court instructed the jury on the elements of Blackorby's FRSA claim. The jury was instructed that "Blackorby is not required to show that the defendant had a retaliatory motive but such motive will prove a violation of [the FRSA] if it contributed or tended to affect in any way the outcome of the decision to take adverse action." As to the damages, BNSF proposed an instruction stating that any emotional distress damages "must be supported by competent evidence of genuine injury." The district court rejected this instruction, however, instead instructing the jury as follows: "[Y]ou must award plaintiff such sum as you find will fairly and justly compensate plaintiff for any damages you find plaintiff sustained as a direct result of the defendant's decision to discipline plaintiff. You must determine the amount of any damages sustained by plaintiff, such as emotional distress damages."

The jury returned a verdict for Blackorby, awarding him $58,280 in damages for emotional distress. The district court denied BNSF's motion for judgment as a matter of law, denied BNSF's motion for a new trial, and awarded costs and attorneys' fees to Blackorby. BNSF now appeals.

II.

Although BNSF raises several arguments, we resolve the present appeal on the issue of the district court's jury instructions. "We review a district court's jury instructions for an abuse of discretion." McCoy v. Augusta Fiberglass Coatings, Inc., 593 F.3d 737, 744 (8th Cir. 2010). "A district court possesses 'broad discretion in instructing the jury, and jury instructions do not need to be technically perfect or even a model of clarity.'" Id. (quoting Brown v. Sandals Resorts Int'l, 284 F.3d 949, 953 (8th Cir. 2002)). But the jury instructions, "taken as a whole," must "fairly and

adequately represent the evidence and applicable law in light of the issues presented to the jury in a particular case." Id. (quoting Brown, 284 F.3d at 953). "[E]ven if we find that a district court erroneously instructed the jury, we will reverse only where the error affects the substantial rights of the parties." Am. Bank of St. Paul v. TD Bank, N.A., 713 F.3d 455, 468 (8th Cir. 2013) (alteration in original) (quoting Der v. Connolly, 666 F.3d 1120, 1126 (8th Cir. 2012)).

"[A] district court's decision to reject a proposed jury instruction also is reviewed for an abuse of discretion." Retz v. Seaton, 741 F.3d 913, 919 (8th Cir. 2014). "A party 'is not entitled to a particularly worded instruction.'" Id. (quoting United States v. Meads, 479 F.3d 598, 601 (8th Cir. 2007)). And "[t]here is no abuse of discretion in a denying a [party's] requested instruction if the instruction[s] actually given by the trial court adequately and correctly cover[ ] the substance of the requested instruction.'" Id. (first alteration added) (quoting Meads, 479 F.3d at 601).

A.

The FRSA's employee-protections provision protects certain acts by railroad employees. See 49 U.S.C. § 20109(a). It provides that "[a] railroad carrier . . . may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee if such discrimination is due, in whole or in part, to the employee's lawful, good faith act done . . . (4) to notify, or attempt to notify, the railroad carrier . . . of a work-related personal injury or work-related illness." Id. To establish a prima facie case under the employee-protections provision, an employee must show "(i) he engaged in a protected activity; (ii) [the railroad carrier] knew or suspected, actually or constructively, that he engaged in the protected activity; (iii) he suffered an adverse action; and (iv) the circumstances raise an inference that the protected activity was a contributing factor in the adverse action." Kuduk, 768 F.3d at 789 (citing 49 U.S.C. § 42121(b)(2)(B)(i)); see also 49 U.S.C. § 20109(d)(2)

-6-

(incorporating into the FRSA the standards and burdens of proof set forth under 49 U.S.C. § 42121(b)).

In the present case, the parties dispute whether the contributing-factor causation standard required Blackorby to show that BNSF intentionally retaliated against him for reporting his injury. Blackorby and the United States (as *amicus curiae*) both urge this Court to follow Araujo v. New Jersey Transit Rail Operations, Inc., 708 F.3d 152 (3d Cir. 2013). In Araujo, the Third Circuit considered whether an employee's injury report was a contributing factor to his discipline. Id. at 160. The court noted that "the term 'contributing factor' is a term of art that has been elaborated upon in the context of other whistleblower statutes." Id. at 158. The court stated that a contributing factor is "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of [the employer's] decision. This test is specifically intended to overrule existing case law, which requires a whistleblower to prove that his protected conduct was a significant, motivating, substantial, or predominant factor." Id. at 158 (emphasis omitted) (quoting Marano v. Dep't of Justice, 2 F.3d 1137, 1140 (Fed. Cir. 1993)); see also 135 Cong. Rec. 5033 (1989) (using the same language to explain why Congress incorporated the contributing-factor standard into the Whistleblower Protection Act). The court further noted that, in the context of other whistleblower statutes employing the contributing-factor standard, "an employee *'need not* demonstrate the existence of a retaliatory motive on the part of the employee taking the alleged prohibited personnel action in order to establish that his disclosure was a contributing factor to the personnel action.'" Araujo, 708 F.3d at 158 (quoting Marano, 2 F.3d at 1141).

The Third Circuit extended this interpretation of the contributing-factor standard to the FRSA's employee-protections provision. Id. at 159–61. In so doing, the court noted that the contributing-factor standard was incorporated into the FRSA in 2007 after Congress examined systemic problems in the railroad industry. Id. at 157, 159–61. The court explained that "the House Committee on Transportation and

Infrastructure held a hearing to 'examine allegations . . . suggesting that railroad safety management programs sometimes either subtly or overtly intimidate employees from reporting on-the-job injuries.'"Id. at 159 (alteration in original) (quoting Impact of Railroad Injury, Accident, and Discipline Policies on the Safety of America's Railroads: Hearing Before the H. Comm. on Transp. and Infrastructure, 110th Cong. at v (2007) (memorandum from Committee's Majority Staff)). The court noted congressional concern that "the underreporting of railroad employee injuries has long been a particular problem." Id. (quoting Impact of Railroad Injury, 110th Cong. at vi). And the court noted concerns "that some railroad supervisors intimidated employees from reporting injuries to the [Federal Railroad Administration ("FRA")], in part, because their compensation depended on low numbers of FRA reportable injuries within their supervisory area." Id. at 161 n.7. Citing this problematic history of injury reporting and railroad programs, the court reasoned that Congress incorporated the contributing-factor standard into the FRSA in order to "reduce[ ] an employee's burden in making a prima facie case." Id. According to the Araujo court, this reduced burden meant—consistent with whistleblower statutes using the contributing-factor standard—that "an employee need not ascribe motive to the employer." See id.

BNSF, however, argues that this Court has already rejected Araujo. In Kuduk, we considered whether, under the FRSA, an employee established a prima facie case that BNSF terminated the employee for his safety report. 768 F.3d at 789–92. In that case, a supervisor, who was aware of the employee's prior safety report, reported the employee for walking between the rails—a serious violation of BNSF rules. Id. at 788. Because the employee already had other serious violations on his record, the employee was discharged by BNSF. Id. Relying on Araujo and a "cat's paw" theory of causation, the employee argued that, because the supervisor knew about the employee's safety report and because it was disputed whether the employee even violated BNSF rules, the employee had established that the safety report was a contributing factor to the supervisor reporting the employee. Id. at 790–91. The

-8-

Kuduk court, however, disagreed. Id. at 791. The court concluded that "the contributing factor that an employee must prove is *intentional retaliation* prompted by the employee engaging in protected activity." Id. (emphasis added). The court then noted that there was no evidence to suggest that the supervisor reacted negatively to the safety report. Id. Further, the court noted that there was no evidence that the BNSF manager who actually disciplined the plaintiff knew about the safety report and, therefore, affirmed the district court's grant of summary judgment to BNSF. Id. at 791, 793.

We find Kuduk controlling. The court reasoned from the general language of the statute that the "essence" of the FRSA's employee-protections provision is "discriminatory animus." Id. at 791 (quoting Staub v. Proctor Hosp., 562 U.S. 411, 1193 (2011)). And, in a footnote, the court expressly rejected the Araujo conclusion which Blackorby now urges this panel to adopt. Id. at 791 n.4 ("In our view, the Araujo panel may have improperly relied on Marano . . . for its no-need-to-show-motive conclusion because the court in Marano was construing a federal employee whistleblower statute that required only an ultimate showing of causation in fact ('because of'), not discrimination.").

Accordingly, regardless of whether we find Araujo persuasive, we are bound to follow Kuduk. See United States v. Anderson, 771 F.3d 1064, 1066 (8th Cir. 2014) ("[I]t is a cardinal rule in our circuit that one panel is bound by the decision of a prior panel." (alteration in the original) (quoting United States v. Betcher, 534 F.3d 820, 823 (8th Cir. 2008)).[1] Because we find no plausible way for this panel to distinguish Kuduk's conclusion that a showing of intentional retaliation is required under the FRSA's employee-protections provision, we hold that the district court abused its discretion when it instructed the jury that Blackorby need not establish

---

[1] In effect, Blackorby argues that we should overrule Kuduk. He may properly raise this contention in a petition for rehearing en banc.

intentional retaliation. "Taken as a whole," the instruction did not "fairly and adequately represent" the law in this Circuit. See McCoy, 593 F.3d at 744 (quoting Brown, 284 F.3d at 953)). Under Kuduk, a jury must find intentional retaliation prompted, at least in part, by the protected activity. The jury instruction in the present case did not require the jury to make such a finding.

Having found the jury instruction improper, we consider the proper disposition of this case. Blackorby argues that he has presented sufficient evidence of intentional retaliation under the contributing-factor standard and is therefore entitled to a new trial on remand. We agree. Under the contributing-factor standard, "[a] prima facie case does not require that the employee *conclusively* demonstrate the employer's retaliatory motive." Kuduk, 768 F.3d at 791 (alteration in original) (emphasis added) (quoting Coppinger-Martin v. Solis, 627 F.3d 745, 750 (9th Cir. 2010)). Indeed, the standard is "more lenient" than other causation standards. Id. at 792. Viewed in the light most favorable to Blackorby, the evidence shows that two BNSF managers repeatedly discouraged him from filing his injury report. BNSF stipulated, moreover, that managers may earn bonuses based on the rates of employee injuries—one of the very concerns examined by Congress before incorporating the contributing-factor standard into the FRSA. See Araujo, 708 F.3d at 159, 161 n.7. This evidence, taken together, sufficiently "raise[s] an inference" that Blackorby's injury report prompted, at least in part, intentional retaliation by BNSF. See Kuduk, 768 F.3d at 789.

B.

Before concluding, we briefly address whether the district court erred in rejecting BNSF's proposed jury instruction regarding emotional distress damages. BNSF proposed an instruction stating that claims of emotional distress "must be supported by competent evidence of genuine injury." We agree that this instruction correctly states the law. See Forshee v. Waterloo Indus., Inc., 178 F.3d 527, 531 (8th Cir. 1999) ("An award of damages for emotional distress must be supported by

-10-

competent evidence of 'genuine injury.'" (quoting Carey v. Piphus, 435 U.S. 247, 264 n.20 (1978)). But we disagree that the district court abused its discretion by rejecting the instruction. Such an instruction, without more, may be misleading because emotional distress damages need not be supported by "medical or other expert evidence." See Bennett v. Riceland Foods, Inc., 721 F.3d 546, 552 (8th Cir. 2013). Further, "[a] plaintiff's own testimony, along with the circumstances of a particular case, can suffice to sustain the plaintiff's burden in this regard." Kim v. Nash Finch Co., 123 F.3d 1046, 1065 (8th Cir. 1997) (quoting Turic v. Holland Hosp., Inc., 85 F.3d 1211, 1215 (6th Cir. 1996)).

III.

Under Kuduk, a plaintiff must establish intentional retaliation to prevail on an FRSA claim. Because the instruction in this case did not require the jury to make such a finding, we reverse and remand for proceedings consistent with this opinion.

_____