# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-2905
_____

Jeffrey Neylon

*Plaintiff - Appellant*

v.

BNSF Railway Company

*Defendant - Appellee*
_____

Appeal from United States District Court
for the District of Nebraska - Lincoln
_____

Submitted: May 13, 2020
Filed: July 31, 2020
_____

Before COLLOTON and BENTON, Circuit Judges, and WILLIAMS,[1] District
Judge.
_____

BENTON, Circuit Judge.

Jeffrey S. Neylon sued BNSF Railway Company for dismissing him, alleging
retaliation for engaging in protected activity under the Federal Railroad Safety Act

_____

[1]The Honorable C. J. Williams, United States District Judge for the Northern
District of Iowa, sitting by designation.

(FRSA), 49 U.S.C. § 20109. The district court[2] granted summary judgment to BNSF. Neylon appeals. Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

## I.

In June 2015, Neylon injured his Achilles tendon while on duty at BNSF. Trying to step up onto a train engine, he felt a "pop" in the tendon three to four inches above the heel, with sharp pain lasting less than a minute. He sank down on his knee for five to ten seconds, got up, took a few steps, but continued working. He did not report the injury to BNSF because he "didn't think anything was wrong."

After the injury, Neylon rolled his ankle "quite a bit" at work, multiple times per day. In fall of 2015, he felt "occasional pain" and "some soreness and tightness" in his Achilles "every once in a while." It felt tender to the touch. Neylon first mentioned the pain to his doctor on November 18, 2015, when seeking treatment for unrelated back problems. By the following fall, in 2016, the tightness "just wouldn't go away" and he had difficulty walking. After work each day, Neylon had to lie down with ice and ibuprofen. He noticed a "lump" forming where his Achilles was injured.

Neylon first sought medical treatment for these symptoms on November 4, 2016. He told the doctor he injured his leg at work in June 2015—"the only time I can remember anything happening to my Achilles." His doctor wrote a note recommending that Neylon "should not return to work until further evaluation by an orthopedic surgeon."

---

[2]The Honorable Richard G. Kopf, United States District Judge for the District of Nebraska.

Neylon "had to notify BNSF" on November 4 about the injury "because I was going to be missing work." Reading the doctor's note, the acting terminal manager asked if it was an on-duty injury. Neylon "told him that the first time I noticed anything was that pop" in June 2015. Neylon told the same thing to a BNSF claims agent who called that evening.

According to Neylon, two days later, on November 6, the superintendent, Allen Wolfe, called him at home, instructing him "to come out and fill out an injury report." Neylon told Wolfe he was on muscle relaxers and would come to the office "when I felt good enough to drive."

On November 11, BNSF notified Neylon of an investigation into his "alleged late/non-report" of his injury and "alleged failure to comply with instructions issued . . . by Terminal Superintendent Allen Wolfe on November 6, 2016 . . . to complete the prescribed injury reporting form."

That same day, Neylon visited an orthopedic surgeon. He told the surgeon he "thinks that he stepped . . . awkwardly onto a train engine 18 months ago." The surgeon diagnosed him with "left watershed Achilles tendinitis," recommending he return to work with restrictions.

On November 14, Neylon completed a personal injury report and handed it to Wolfe. To "describe injuries or illness/condition," Neylon wrote, "Achilles Tendonitis [sic]." For "date of injury," he wrote "June 2015." He later explained that was "the first time I noticed anything with that part of my body." For the date "first treated or diagnosed," he wrote "Nov. 11 2016." To "describe fully how injury, illness or condition occurred," he wrote, "Stepped up on engine and felt a pop in left leg."

After a hearing, the conducting officer recommended dismissing Neylon for (1) late reporting and (2) disobeying Wolfe's instructions to report. The officer also recommended a separate investigation into whether Neylon was dishonest in his injury report (because it contradicted his hearing testimony). Late reporting of an injury is a "serious" violation of BNSF's policy. The policy allowed dismissal because Neylon was within the review period for a prior serious violation (for "indifference to duty").

A BNSF review team agreed with dismissing Neylon for late reporting, noting he violated multiple rules by failing to report the June 2015 injury until November 2016. The review team disagreed with the disobedience and dishonesty recommendations.

Based on the recommendations of the conducting officer and review team, the regional general manager authorized dismissing Neylon. BNSF notified him that he was dismissed "for late report/failure to report a personal injury." BNSF said he violated rules requiring that all personal injuries "while on duty or on company property . . . be immediately reported to the proper manager and the prescribed form completed." BNSF said he violated a rule requiring that employees "must not withhold information, or fail to give all the facts to those authorized to receive information regarding . . . personal injuries." BNSF also said he violated a rule barring negligent conduct. BNSF informed him it had considered his discipline record and its employee policy.

Neylon appealed through his union to a Public Law Board, an arbitration panel under the Railway Labor Act. *See generally* **45 U.S.C. § 153 Second** (allowing special adjustment boards); **29 C.F.R. § 1207.1** (governing establishment of "special adjustment boards," "referred to as PL Boards"). The board found sufficient evidence for BNSF's finding that Neylon violated its rules by failing to report his injury in June 2015. However, the board found his dismissal "unreasonable and arbitrary

-4-

given these circumstances." The board noted that Neylon's "injury was not one that he believed would really be a problem until several months later." He "eventually received a full medical release and was able to return to work." Thus, the board ordered Neylon "reinstated . . . but without back pay." His time off work was "considered a lengthy disciplinary suspension for his technical violation of the rules."

Neylon filed a complaint under the FRSA with the Occupational Safety and Health Administration. *See* **49 U.S.C. § 20109(d)(1)**. He alleged BNSF dismissed him in retaliation for reporting a work-related injury. The Acting Secretary of Labor found no FRSA violation, because Neylon "felt a 'pop' in his ankle in June 2015 but did not report it" to BNSF "until November 4, 2016." Further, he was dismissed "for late reporting, which is a violation of [BNSF's] rules governing the reporting of on-duty injuries, and not for reporting the injury itself."

Neylon sued BNSF in federal district court. He claimed BNSF dismissed him in retaliation for reporting a work-related injury. *See* **49 U.S.C. § 20109(a)(4)**. The district court granted summary judgment to BNSF. He appeals.

This court reviews de novo a grant of summary judgment. ***Torgerson v. City of Rochester***, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). The district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." **Fed. R. Civ. P. 56(a)**. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." ***Torgerson***, 643 F.3d at 1042.

II.

Neylon argues that the district court erred by granting summary judgment on his claim that he was dismissed in retaliation for reporting his injury. "To establish

a prima facie case of unlawful FRSA retaliation, an employee must show, by a preponderance of the evidence: '(i) he engaged in a protected activity; (ii) the rail carrier knew or suspected, actually or constructively, that he engaged in the protected activity; (iii) he suffered an adverse action; and (iv) the circumstances raise an inference that the protected activity was a contributing factor in the adverse action.'" ***Dakota, Minn., & E. R.R. Corp. v. U.S. Dep't of Labor Admin. Review Bd.***, 948 F.3d 940, 943-44 (8th Cir. 2020) (cleaned up)*, quoting* ***Kuduk v. BNSF Ry. Co.***, 768 F.3d 786, 789 (8th Cir. 2014). *See* **49 U.S.C. §§ 20109(a)**, **20109(d)(2)(A)(i)**, **42121(b)(2)(B)(i)**. Reporting "a work-related personal injury" is a protected activity. **§ 20109(a)(4)**.

At issue is only the fourth element. The "contributing factor that an employee must prove is *intentional retaliation* prompted by the employee engaging in protected activity." ***Blackorby v. BNSF Ry. Co.***, 849 F.3d 716, 721 (8th Cir. 2017) (emphasis in original)*, citing* ***Kuduk***, 768 F.3d at 791. *See also* ***Smith-Bunge v. Wisconsin Cent., Ltd.***, 946 F.3d 420, 424 (8th Cir. 2019) (same).

## A.

Neylon contends that by requiring intentional retaliation, this court misinterprets "contributing factor." *See* ***Kuduk***, 768 F.3d at 791 (requiring intentional retaliation)*, citing* **49 U.S.C. § 20109(a)**. He believes he need not show intentional retaliation. However, "it is a cardinal rule in our circuit that one panel is bound by the decision of a prior panel." ***Dakota***, 948 F.3d at 946 (holding an administrative review board must apply the "intentional retaliation" standard of *Kuduk*). This court is "bound to follow *Kuduk*." *See* ***Blackorby***, 849 F.3d at 722 & 722 n.1 (requiring intentional retaliation) ("In effect, Blackorby argues that we should overrule *Kuduk*. He may properly raise this contention in a petition for rehearing en banc.").

To support his assertion that he need not show intentional retaliation, Neylon relies on cases from other circuits. He ignores the circuits that have expressly approved this court's reasoning. *See Armstrong v. BNSF Ry. Co.*, 880 F.3d 377, 382 (7th Cir. 2018) (holding "the statutory text requires a showing that retaliation was a motivating factor")*, citing with approval Kuduk*, 768 F.3d at 791 (holding "the essence of this intentional tort is discriminatory animus"). *See also Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1212-14 (10th Cir. 2018) (holding "the protected activity must be a cause of the unfavorable personnel action," and rejecting FRSA claims for lack of "a retaliatory motive")*, citing with approval Kuduk*, 768 F.3d at 791. This court already expressly rejected the two cases that Neylon repeatedly cites and discusses. *See Blackorby*, 849 F.3d at 721-22*, rejecting Araujo v. N.J. Transit Rail Ops., Inc.*, 708 F.3d 152, 161 (3d Cir. 2013) (holding employee "is not required to provide evidence of motive"). *See also Kuduk*, 768 F.3d at 791 n.4 (noting "the *Araujo* panel may have improperly relied on *Marano v. Dep't of Justice*, 2 F.3d 1137 (Fed. Cir. 1993), for its no-need-to-show-motive conclusion because the court in *Marano* was construing a federal employee whistleblower statute that required only an ultimate showing of causation in fact ('because of'), not discrimination"). Other cases that Neylon cites are compatible with *Kuduk*. *See Lowery v. CSX Transp., Inc.*, 690 F. Appx. 98, 100 & 101 n.2 (4th Cir. 2017) (holding retaliatory animus showed a "contributing factor") (noting *Kuduk* was not contrary to the finding of cat's-paw liability). *See also Kuduk*, 768 F.3d at 791*, citing with approval Consol. Rail Corp. v. U.S. Dep't of Labor*, 567 F. Appx. 334, 338 (6th Cir. 2014) (concluding there was "substantial evidence that animus was a contributing factor" in termination). *Compare Kuduk*, 768 F.3d at 791 ("We agree with the Ninth Circuit that, under the statute's 'contributing factor' causation standard, 'a prima facie case does not require that the employee conclusively demonstrate the employer's retaliatory motive.")*, quoting Coppinger-Martin v. Solis*, 627 F.3d 745, 750 (9th Cir. 2010)*, with Frost v. BNSF Ry. Co.*, 914 F.3d 1189, 1196 (9th Cir. 2019) (holding that "by proving that an employee's protected activity contributed in some way to the employer's adverse conduct, the FRSA plaintiff has proven that the employer acted with some level of

retaliatory intent"), *discussing **Kuduk***, 768 F.3d at 791. Other circuits have not decided whether the FRSA requires intentional retaliation. *See **Epple v. BNSF Ry. Co.***, 785 F. Appx. 219, 222-23 (5th Cir. 2019) (noting circuit split and declining to decide issue); ***Sirois v. Long Island R.R. Co.***, 797 F. Appx. 56, 59 n.4 (2d Cir. 2020) ("Whether a retaliation claim requires a showing of intent is . . . an open question in this Circuit."). Regardless of other circuits' decisions, this court requires Neylon to show intentional retaliation. *See **Blackorby***, 849 F.3d at 722.

## B.

Anticipating the intentional-retaliation standard, Neylon argues that BNSF intentionally retaliated because it dismissed him for reporting his injury. He acknowledges he injured his Achilles on duty in June 2015 and did not report it until November 2016—seventeen months later. BNSF's rules require reporting on-duty injuries "immediately" "by the first means of communication," and at the latest, within 72 hours. Late reporting is a "serious" violation. Neylon was within the review period for a prior serious violation, authorizing dismissal.

Neylon emphasizes that the Public Law Board found his dismissal an "unreasonable and arbitrary" discipline. However, the board also found that he violated BNSF's rules by reporting his injury 17 months late, and thus deserved suspension without pay. By itself, the board's finding that BNSF engaged in unreasonable and arbitrary discipline does not show retaliation. *See **Foster v. BNSF Ry. Co.***, 866 F.3d 962, 969 (8th Cir. 2017) (holding that "erroneous company findings alone do not violate the retaliation provisions of the FRSA" without evidence of intentional retaliation). *See also **Mercier v. United States Dep't of Labor***, 850 F.3d 382, 390 (8th Cir. 2017) ("The fact that Mercier was eventually cleared by the CBA arbitration process and has returned to work . . . has no bearing on whether the . . . termination was in retaliation for reporting safety violations.").

Neylon also contends he would not have been disciplined for late reporting "but for" his report. However, he "must demonstrate more than a mere factual connection between his injury report and his discipline in order to establish a prima facie case under the contributing-factor standard." *See Heim v. BNSF Ry. Co.*, 849 F.3d 723, 727 (8th Cir. 2017). The "temporal proximity" of his report to his punishment, without more, does not show intentional retaliation, especially where his supervisor "*pressured* him to fill out the report." *See id.* (emphasis in original) (holding employee did not establish prima facie case of intentional retaliation). True, "the report and the discipline were an inextricably intertwined chain of events." *See Dakota*, 948 F.3d at 946 (cleaned up). However, "no sinister inference may be drawn from this chain of events" because an "injury report is a normal trigger for an investigation designed to uncover facts that can prompt corrective action that will reduce the likelihood of a future injury." *Id.* "It is well settled that employees cannot immunize themselves against wrongdoing by disclosing it in a protected-activity report." *Id.* (cleaned up) (holding that punishing employee for late reporting was not intentional retaliation). Here, "the protected activity was the untimely filing of a report" that BNSF's "rules require employees to promptly file, consistent with railroad safety." *See id.* Disciplining Neylon "for violating that rule does not, without more, evidence discrimination against a good faith rail safety whistleblower." *See id.* Neylon believes that the rule requiring injury-reporting within 72 hours does not increase workers' safety. Even if he were correct, enforcing the rule does not show intentional retaliation. *See id.*

According to Neylon, BNSF has a "culture of retaliating against employees who report injuries." He asserts BNSF has a financial incentive to blame employees for their injuries and dismiss them, to avoid paying for medical treatment or having to report lost workdays to regulatory authorities. However, Neylon does not identify evidence that any incentive motivated the decision-makers who dismissed him. *See Heim*, 849 F.3d at 727 (holding bonuses for company-wide reduction of reportable injuries did not show individual supervisors intentionally retaliated against employee for reporting injury). *Cf. Mathews v. Trilogy Comm'cns, Inc.*, 143 F.3d 1160, 1166-

-9-

67 (8th Cir. 1998) (holding that dismissing employee after substantial claim under employer's self-insured medical plan did not show retaliatory motive).

Neylon also asserts that BNSF gives supervisors a "personal motive" to retaliate, by ranking them based on reported injuries and lost workdays. He again cites no evidence that BNSF penalizes or rewards supervisors based on these rankings. *See* **Fed. R. Civ. P. 56(c)(1)(A)** (requiring party to cite to "particular parts of materials in the record" on summary judgment). BNSF counter-asserts that the rankings "glean best practices" and help supervisors reach safety goals. Regardless, Neylon does not show that the decision-makers who dismissed him were subject to rankings. *See* **Blackorby**, 849 F.3d at 722 (holding intentional retaliation must be "prompted, at least in part, by the protected activity").

Shifting the focus, Neylon argues that BNSF motivates supervisors to retaliate by basing their evaluations on injuries and lost workdays. True, the evaluations of two decision-makers who recommended his dismissal discuss safety. The evaluations mention many safety metrics, including accident frequency and severity, fatalities, decertification, training, and communication. Seven of each evaluation's ten pages are dedicated to non-safety performance measures. Neylon does not identify evidence that reporting his injury harmed the decision-makers' evaluations, promotions, or pay. *Cf.* **Hysten v. BNSF Ry. Co.**, 530 F.3d 1260, 1272 (10th Cir. 2008) (holding that jury could infer retaliatory motive because supervisor said the rate of on-duty injuries affected his evaluation, dictating his salary). He does not show that considering safety on decision-makers' evaluations motivated them to dismiss him for reporting an injury. *Cf.* **Mlynczak v. Bodman**, 442 F.3d 1050, 1054, 1058-59 (7th Cir. 2006) (holding that a manager did not show reverse discrimination, although he was evaluated on achieving diversity goals, among 11 other unrelated factors, because the diversity program included a wide variety of programs unrelated to the contested hiring decisions).

In a variation on the theme, Neylon claims BNSF's bonus program gives supervisors a financial incentive to retaliate. He cites evidence that BNSF pays bonuses for company-wide safety performance (not the individual supervisors' safety performance). Without more evidence of animus, the bonus program alone does not indicate that animus motivated the decision-makers who dismissed him. *See **Heim***, 849 F.3d at 727 (holding BNSF's bonuses for company-wide reduction of reportable injuries did not show intentional retaliation, despite temporal proximity between an employee's injury report and discipline). Neylon, in fact, acknowledges that Superintendent Wolfe told him to file an injury report. *See **Heim***, 849 F.3d at 727 (holding employee did not show intentional retaliation for reporting because his supervisor "*pressured* him to fill out the report") (emphasis in original). *Cf. **Blackorby***, 849 F.3d at 722 (holding managers' repeatedly discouraging reporting injuries, together with bonus program, raises inference of intentional retaliation). Neylon does not show that animus motivated the decision-makers who dismissed him.

As animus against injury-reporters, Neylon highlights a claims agent's comments five years before his dismissal. In 2011, he asked a claims agent whether an injury he reported would go on his permanent record. According to Neylon, the claims agent replied that injuries are all kept on record, and multiple injuries could be subject to punishment. Neylon does not show that this agent, whose name he does not recall, influenced the decision-makers who dismissed him five years later. *See **Gunderson v. BNSF Ry. Co.***, 850 F.3d 962, 970 (8th Cir. 2017) (holding managers did not serve as "cat's paws" to the ultimate decision-maker because employee did not show they influenced the discharge decisions). *See also **Loos v. BNSF Ry. Co.***, 865 F.3d 1106, 1115 (8th Cir 2017) (holding employer lacked retaliatory motive because supervisor's comment expressing retaliatory animus did not reflect employer's intent or influence the ultimate decision-maker)*, rev'd and remanded on other grounds*, 139 S. Ct. 893 (2019)*, opinion reinstated on FRSA claim,* 920 F.3d 1218, 1218 (8th Cir. 2019) (mem.).

The record as a whole could not lead a rational trier of fact to find that Neylon's injury report prompted BNSF to intentionally retaliate against him.

* * * * * * *

The judgment is affirmed.

_____