# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-1648

_____

Rita Foster; Brian Kline; Michael Snyder,

*Plaintiffs - Appellants,*

v.

BNSF Railway Company, a Delaware Corporation,

*Defendant - Appellee.*

_____

Appeal from United States District Court
for the Southern District of Iowa - Des Moines

_____

Submitted: January 11, 2017
Filed: August 10, 2017

_____

Before WOLLMAN, MURPHY, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Three railroad employees appeal the district court's[1] grant of summary judgment for BNSF Railway Company on the employees' retaliation claims under the Federal Railroad Safety Act, 49 U.S.C. § 20109(a)(1)(C). The district court correctly

_____

[1]The Honorable John A. Jarvey, Chief Judge, United States District Court for the Southern District of Iowa.

dismissed certain claims for failure to exhaust administrative remedies, and we conclude that the exhausted claims were properly dismissed on the merits. We therefore affirm the judgment.

I.

In the early morning hours on April 2, 2012, Rita Foster, Brian Kline, Michael Snyder, and a fellow crewmember were operating a train heading eastbound. Foster, Kline, and Snyder are the plaintiffs in the district court and the appellants here. The crew on their train was scheduled to change near a bridge outside Creston, Iowa. To the east of the bridge is a parking area for vans to drop off the outbound crews and pick up the inbound crews.

The parties dispute where the crew change was supposed to occur; the employees allege that they were told to stop west of the bridge and then walk over it. The bridge had no walkway, handrail, or overhead lighting. As the crew members were bringing the train to a stop west of the bridge, they saw John Moore, a member of the outbound crew, walk across the bridge and suddenly fall off the bridge to the road below. The crew members rushed to Moore's aid and called for emergency assistance. Emergency medical personnel soon arrived and transported Moore to the hospital.

Foster, Kline, Snyder, and the other crew members then provided written statements to Trainmaster Thurston Dixon describing what had happened. In their statements, Kline and Snyder mentioned the unsafe conditions at the bridge—specifically, the lack of side rails and lighting. A few days later, on April 5, Foster spoke to BNSF Claims Representative Justin Murphy and provided a recorded statement about the accident. Foster noted that she and the others were confused about why BNSF told them to change crews west of the bridge, because employees previously had reported to BNSF that it was a dangerous location.

The following day, the plaintiffs and the other crewmembers involved in the accident received notice that BNSF was investigating possible rule infractions by BNSF employees in connection with the accident. The notice stated that BNSF would hold a hearing on the matter, and that Trainmaster Dixon and Road Foreman of Engines Jared Knutstrom would serve as witnesses. The hearing was initially scheduled for April 11, but was later postponed several times. On April 12 and 13, Snyder and Kline gave their statements to Claims Representative Murphy. Both noted the unsafe walking conditions on the bridge.

The plaintiffs allege that while the rescheduled hearing date was pending, BNSF subjected them to increased operations testing, which was defined by the district court as a foreman observing an employee's work without the employee's knowledge. Kline and Snyder claim that they felt that they had to avoid inexperienced or sloppy co-workers for fear that the company would blame them for the mistakes of others. Kline and Snyder also assert that, on account of this fear, they signed up for different work that was less lucrative in some instances.

The investigative hearing was held on January 7 and 8, 2013, before a BNSF conducting officer. Throughout the hearing, each plaintiff was accompanied by a union representative who could question witnesses, object to testimony, and enter exhibits. The plaintiffs also were permitted to ask questions of the witnesses. Knutstrom and Dixon were sequestered during the testimony of other witnesses.

During their testimonies, Knutstrom and Dixon reviewed the video evidence from the night of the accident and pointed out what they believed to be rule infractions committed by the plaintiffs and the other crewmembers. Both explained that although the crew-change location was not written down, employees were orally instructed to change crews east of the bridge. The plaintiffs and the other crewmembers contradicted Knutstrom and Dixon. They testified that company officials told them to change crews west of the bridge.

Following the hearing, BNSF's Nebraska Division General Manager Janssen Thompson reviewed the transcripts and exhibits. He disciplined the crewmembers, including the three plaintiffs, for various rule infractions. These included failing to blow the train's whistle and to use flashlights, improperly turning off the train's headlight, and fouling the tracks. As discipline, Thompson gave Snyder a formal reprimand on his record and Kline a thirty-day "record suspension," meaning that Kline's record reflected a suspension but that he was not actually suspended. Snyder and Kline both received a one-year review period (akin to probation) during which they could be fired for additional violations. Because Foster was serving a three-year review period for a previous violation, Thompson fired her. The plaintiffs appealed the decision to a Public Law Board, a three-person arbitration panel established under the Railway Labor Act. *See* 45 U.S.C. § 153. The Board reinstated Foster without awarding back pay, removed the reprimand from Snyder's record, and removed the suspension from Kline's record.

The plaintiffs filed an administrative complaint with the Occupational Safety and Health Administration (OSHA), alleging that BNSF had retaliated against them for providing information about a violation of federal railroad safety laws, in violation of the Federal Railroad Safety Act (FRSA), 49 U.S.C. § 20109(a)(1)(C). *See* 49 U.S.C. § 20109(d)(1); 29 C.F.R. § 1982.103. After OSHA did not issue a final decision within the 210-day statutory period, the plaintiffs filed this suit in federal court as permitted by law. *See* 49 U.S.C. § 20109(d)(3); 29 C.F.R. § 1982.103. They claim that they provided information about violations of federal law three separate times when they described the unsafe conditions on the bridge: (1) in their handwritten statements to Dixon, (2) in their statements to Murphy, and (3) in their testimony at the hearing. The plaintiffs allege that because of their statements, BNSF took adverse action against them in the form of scheduling a formal investigation, delaying the investigation, engaging in excessive operations testing, pressuring them to avoid higher-paying work, and ultimately disciplining them.

BNSF moved for summary judgment, arguing that the plaintiffs failed to exhaust some of their claims before the administrative agency, that they were required to arbitrate others, and that they did not establish a *prima facie* case of retaliation. The district court granted BNSF's motion on several grounds. The court determined that the employees could not pursue certain claims, because they did not present those claims in their administrative complaint to OSHA as required by the statute. The court also concluded that the plaintiffs failed to show that they engaged in protected activity when they reported alleged violations of the Federal Employers Liability Act, 45 U.S.C. § 51. Alternatively, the court ruled that even if the plaintiffs engaged in protected activity, they could not prevail because they failed to show that the protected activity contributed to the adverse actions.

We review a district court's grant of summary judgment *de novo*, viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party. *Davis v. Jefferson Hosp. Ass'n*, 685 F.3d 675, 680 (8th Cir. 2012). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

II.

The district court concluded that the plaintiffs failed to exhaust administrative remedies for claims based on the increase in operations testing, the pressure to accept lower-paying work, and the statements to Murphy, because the plaintiffs did not include those claims in their complaint to OSHA. The plaintiffs assert that the FRSA does not include an administrative exhaustion requirement. Section 20109(d)(1) provides that an employee alleging unlawful discrimination under § 20109(a)-(c) "may seek relief in accordance with the provisions of this section, with any petition or other request for relief under this section *to be initiated by* filing a complaint with the Secretary of Labor." 49 U.S.C. § 20109(d)(1) (emphasis added). The text of the

-5-

statute therefore makes clear that to receive relief under the FRSA, litigants must first file a complaint with OSHA alleging unlawful discrimination. *See* 49 U.S.C. § 20109(d)(2); 49 U.S.C. § 42121(b)(1); 29 C.F.R. § 1982.103.

The next question is what standard to apply in determining whether an employee's complaint filed with OSHA adequately exhausts a claim that the employee later brings in court under the FRSA. The parties assume, with little explanation, that we should apply the standard applicable in cases arising under Title VII of the Civil Rights Act for reviewing whether complaints filed with the Equal Employment Opportunity Commission have exhausted administrative remedies. *See, e.g.*, *Brisbois v. Soo Line R.R. Co.*, 124 F. Supp. 3d 891, 899-900 (D. Minn. 2015). That conclusion is not self-evident. The text of the exhaustion provisions is not the same, and the Title VII cases rely in part on policy reasons that may or may not apply under the FRSA. But as we see this case, the precise standard for evaluating exhaustion will not affect the result: some of the plaintiffs' claims are clearly exhausted, and others clearly are not, even under the generous standard applied under Title VII. We therefore assume for the sake of analysis that the Title VII exhaustion standard applies.

In the Title VII context, "[t]he exhaustion requirement may be satisfied if the civil claim 'grows out of or is like or reasonably related to the substance of the allegations in the administrative charge.'" *Fanning v. Potter*, 614 F.3d 845, 851 (8th Cir. 2010) (quoting *Dorsey v. Pinnacle Automation Co.*, 278 F.3d 830, 838 (8th Cir. 2002)). But a litigant's civil claim can be only "as broad as the scope of any investigation that reasonably could have been expected to result from the initial charge of discrimination." *Stuart v. Gen. Motors Corp.*, 217 F.3d 621, 631 (8th Cir. 2000).

We agree with the district court that the plaintiffs have failed to exhaust certain claims. First, when complaining about adverse actions, the plaintiffs' complaint to

OSHA never mentioned increased operations testing or company pressure to accept lower-paying work. The complaint focused on BNSF's investigation process into the plaintiffs' alleged rule violations, including the investigation notice, the several postponements, and the ultimate investigative hearing and subsequent discipline. We disagree with the plaintiffs that the remaining allegations flow naturally from their OSHA complaint. There is no evidence that increased operations testing or the plaintiffs' feelings about pressure to accept lower-paying work were part of, or were reasonably related to, BNSF's investigation into the plaintiffs' rule violations. OSHA could not reasonably be expected to investigate these alleged adverse actions based on a complaint that never mentioned them. *See Fanning*, 614 F.3d at 852. Thus, the district court properly concluded that claims asserting these additional adverse actions are unrelated to the claims in the plaintiffs' OSHA complaint and unexhausted.

Second, we agree with the district court that the plaintiffs failed to exhaust their claims asserting retaliation for alleged protected activity in their statements to Claims Representative Murphy. In their OSHA complaint, the plaintiffs asserted that BNSF retaliated against them for "providing information to their supervisors in the form of written statements on the night of the accident, and through testimony at the formal investigation." The complaint did not mention any statements to Murphy or a BNSF claims representative generically. In Title VII cases, a claim that is not mentioned in an administrative complaint nonetheless can be exhausted if the claim is developed during the course of the agency's investigation. *See EEOC v. Delight Wholesale Co.*, 973 F.2d 664, 668-69 (8th Cir. 1992). But there is no evidence that OSHA considered or developed an allegation of discrimination because of statements to Murphy. As a claims representative, Murphy investigated Moore's accident to determine whether Moore would bring a claim against BNSF. There is no evidence that Murphy was involved in BNSF's investigation into the plaintiffs' alleged rule violations. Because the OSHA complaint did not mention the statements to Murphy, and these statements were not part of BNSF's investigation into the plaintiffs' rule

violations, claims based on the statements to Murphy are unrelated to the claims raised in the complaint and therefore were not exhausted.

## III.

The district court concluded that claims that were properly exhausted failed on the merits. The FRSA provides that a railroad carrier may not reprimand or discriminate against an employee "if such discrimination is due, in whole or in part, to the employee's lawful, good faith act done . . . (1) to provide information . . . regarding any conduct which the employee reasonably believes constitutes a violation of any Federal law, rule, or regulation relating to railroad safety." 49 U.S.C. § 20109(a)(1). To establish what this court has called "a *prima facie* case" of retaliation, an employee must show that "(i) he engaged in a protected activity; (ii) BNSF knew or suspected, actually or constructively, that he engaged in the protected activity; (iii) he suffered an adverse action; and (iv) the circumstances raise an inference that the protected activity was a contributing factor in the adverse action." *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 789 (8th Cir. 2014). If the employee establishes these conditions, then he will prevail unless the carrier demonstrates by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of the employee's protected activity. 49 U.S.C. § 42121(b)(2)(B)(ii).

The plaintiffs allege that they engaged in protected activity when they reported what they characterize as a violation of the Federal Employers Liability Act. The FELA provides that a common carrier is liable in damages to any employee who suffers injury due to the carrier's negligence. 45 U.S.C. § 51. Protected activity under the FRSA includes providing information regarding "any conduct which the employee reasonably believes constitutes a violation of any Federal law, rule, or regulation relating to railroad safety or security." 49 U.S.C. § 20109(a)(1). We assume for the sake of analysis that providing information about an injury caused by

-8-

the carrier's negligence, which could give rise to liability under the FELA, can constitute protected activity under § 20109(a)(1).

Even so, we conclude that the plaintiffs' first alleged protected activity—handwritten statements to Dixon—falls short of satisfying § 20109(a)(1). In Kline's handwritten statement to Dixon, he stated: "I knew from being out there before that there was a bridge out there that had no siderails and there was no lighting. We talk about the bridge every time we go out there that it is unsafe." Snyder wrote: "[T]he pilot was instructing me where to stop the train and informing me of the poor walking conditions at this location."

If the plaintiffs had brought a claim under § 20109(b)(1)(A), which forbids discrimination against an employee for "reporting, in good faith, a hazardous safety or security condition," then these statements would be protected activity. But the plaintiffs admit that they "intentionally abandoned any possible claim under § 20109(b)(1)(A) because of the weakness of such a claim." Appellants' Br. 13. The plaintiffs explain that other employees previously had complained about the hazardous conditions at the bridge, and that BNSF did not retaliate against those employees for their reports. They concede, therefore, that "the evidence does not support a conclusion that BNSF was motivated to retaliate against employees who simply reported the hazardous condition." *Id.*

The plaintiffs now claim instead that their handwritten statements to Dixon constituted the provision of information "regarding any conduct which the employee reasonably believes constitutes a violation of any Federal law," which is protected under § 20109(a)(1). The asserted FELA violation here is that BNSF knew about the unsafe conditions at the bridge, but did nothing to remedy them. The handwritten statements by Snyder and Kline, however, simply report a hazardous condition. They do not claim that BNSF knew about the conditions at the bridge or that the company failed to remedy known, hazardous conditions. Thus, these statements cannot

constitute protected activity under § 20109(a)(1) that forms the basis of an FRSA retaliation claim.

The plaintiffs' last alleged protected activity is their testimony at the investigative hearing. To prove a claim based on this activity, the plaintiffs must show that testimony was a contributing factor in an adverse action taken by the company. The employees must show "intentional retaliation prompted by the employee engaging in protected activity." *Kuduk*, 768 F.3d at 791. Two of the adverse actions about which the plaintiffs complain—that BNSF initiated an investigation of potential rules violations and repeatedly delayed an investigative hearing—occurred *before* the plaintiffs' testimony at the hearing. The plaintiffs' testimony could not have contributed to earlier adverse actions.

The final adverse action is the discipline imposed by the company for rule violations. The plaintiffs do not assert that the ultimate decisionmaker on discipline, Thompson, acted with retaliatory motive. Their theory is that Dixon and Knutstrom are the culprits from BNSF. Dixon and Knutstrom were subject to potential discipline or liability for establishing the wrong crew-change location that led to the injury of employee Moore. So they allegedly retaliated against Foster, Kline, and Snyder when these employees reported information suggesting that Dixon and Knutstrom were negligent. This retaliation allegedly was a proximate cause of the adverse actions by Thompson, even though Thompson himself did not intend to retaliate. *Cf. Staub v. Proctor Hosp.*, 562 U.S. 411, 418-20 (2011).

There is insufficient evidence to make a submissible case on this theory. The plaintiffs assert that Dixon and Knutstrom lied at the investigative hearing in an effort to shift blame for the Moore accident to the plaintiffs. This effort was designed, say the plaintiffs, to help Dixon and Knutstrom avoid discipline for their failure to ensure that crew changes occurred at the proper location. But Dixon and Knutstrom testified at the hearing *before* the plaintiffs gave their protected statements at the hearing.

-10-

Even if the testimony of Dixon and Knutstrom contributed to the eventual discipline of the plaintiffs, their testimony could not have been in retaliation for employee testimony that had not yet occurred.

The plaintiffs also complain that there was no basis for BNSF to find that they violated company rules. But erroneous company findings alone do not violate the retaliation provisions of the FRSA. Without evidence that the company issued the findings to retaliate intentionally for protected activity, there is no basis for relief under the FRSA. *See Kuduk*, 768 F.3d at 792.

The plaintiffs argue finally that their protected activity and the adverse actions are "inextricably intertwined." They claim that their case is analogous to a situation in which an employee reports his own injury and then suffers discipline when the company investigates the incident and finds that a rule violation caused the injury. We recently held that such a factual connection between an injury report and discipline is insufficient to establish the contributing-factor element of a retaliation claim under the FRSA. An employee must "demonstrate that BNSF's discipline was, at least in part, intentional retaliation" for protected activity. *Heim v. BNSF Ry. Co.*, 849 F.3d 723, 727 (8th Cir. 2017). The plaintiffs' claim here is even weaker, because they did not report Moore's injury, and the company's investigation of the incident did not arise from the plaintiffs' reports.

\* \* \*

For the foregoing reasons, the judgment of the district court is affirmed.
_____

-11-