In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 16-3674 & 17-1088

GLEN ARMSTRONG, SR.,

*Plaintiff-Appellant,*

*v.*

BNSF RAILWAY COMPANY, d/b/a THE
BURLINGTON NORTHERN SANTA FE
RAILWAY COMPANY,

*Defendant-Appellee.*

---

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 C 7962 — **John Robert Blakey**, *Judge.*

---

ARGUED SEPTEMBER 18, 2017 — DECIDED JANUARY 18, 2018

---

Before BAUER, FLAUM, and SYKES, *Circuit Judges*.

BAUER, *Circuit Judge.* After he was fired, Glen Armstrong
sued his former employer, BNSF Railway Company (BNSF),
under the Federal Rail Safety Act, 49 U.S.C. § 20109 *et seq.*
(FRSA), alleging unlawful retaliation. The case proceeded to

trial, and a jury returned a verdict in favor of BNSF. Armstrong appeals, contending that an improper jury instruction misled the jury. We affirm.

## I.  BACKGROUND

On May 4, 2010, Armstrong was working as the conductor on a BNSF Metra line train that arrived at Union Station in Chicago at approximately 5:30 p.m. Armstrong's supervisor, Chris Motley, was sitting in the "Glasshouse," an office in Union Station with windows looking onto the tracks, and saw Armstrong exit the train and stand on the platform. Motley noticed that Armstrong was not wearing the proper uniform for the third time in two weeks and called him on the radio to tell him to come to the Glasshouse.

BNSF Metra trains are equipped with on-board video cameras, one of which was positioned so as to capture images of the door to the Glasshouse, the ramp leading to that door, and partial views of the inside of the Glasshouse, including Motley's desk, through a window. The video camera captured Armstrong walking up the platform and entering the Glasshouse. John Nelson, another conductor, was also in the Glasshouse when Armstrong entered, but left approximately 30 seconds later.

At trial, Armstrong testified that when he entered, Motley began yelling at him about his uniform. He stated that he tried to leave because he felt threatened by Motley's behavior. According to Armstrong, when he tried to go back through the door, Motley pushed it shut, striking his left knee and foot. Armstrong admitted that this could not be seen on the video recording, but noted that there were approximately nine

seconds of the video during which neither Armstrong nor Motley could be seen. He said he did not feel pain initially, but a short time later, he felt tingling and throbbing that continued to worsen.

BNSF presented a different story at trial. Nelson testified that when he exited the Glasshouse, he could hear Armstrong curse and yell at Motley. Nelson heard Armstrong say that he refused to talk to Motley until his union representative arrived. At that point, Motley told Armstrong that he was being removed from service for insubordination. Armstrong then left the Glasshouse. BNSF showed the video recording at trial, which showed Motley standing some distance from the door as Armstrong exited. According to Motley, that distance was approximately 10 to 12 feet, and he testified that he did not push the door shut on Armstrong as he left.

Once Armstrong left the Glasshouse, Motley called his supervisor, Clayton Johanson, to inform him that Armstrong had been removed from service for insubordination. Johanson immediately went to Union Station to address the situation. Johanson spoke with Motley in the Glasshouse, then asked Armstrong to write out a statement about what happened. Armstrong wrote that Motley slammed the door on his leg, smashing his knee and ankle. Johanson then took Armstrong to a clinic on site where he was provided a soft walking shoe.

Johanson called his supervisor, Timothy Merriweather, to inform him of the incident, who in turn informed the General Manager, Matthew Igoe. Igoe reported the incident to Duncan Brown, the Director of Human Resources. On May 5, 2010, the day after the incident, Brown interviewed and took statements

from Nelson, Motley, and Johanson. He also secured the video recording, which both he and Igoe reviewed. Brown and Igoe both testified at trial that, based on their review of the video, they believed Motley could not have slammed the door on Armstrong's leg and that the incident could not have occurred the way Armstrong described it in his statement.

Pursuant to the United Transportation Union's collective bargaining agreement with BNSF, Armstrong was entitled to an investigation hearing prior to the assessment of any formal discipline. On May 13, 2010, BNSF issued Armstrong a notice of investigation for insubordination, dishonesty, and misrepresentation.

After numerous continuances, BNSF conducted an investigation hearing on March 25, 2011. Terminal Superintendent Randy McMahan served as the conducting officer. The local union chairman represented Armstrong at the hearing. Merriweather presented the evidence, including the video recording, on behalf of BNSF. Armstrong testified on his own behalf, but did not call other witnesses or present any other evidence. Based on the presentations at the hearing, McMahan concluded that Armstrong had lied about what occurred in the Glasshouse, and he recommended that Armstrong be terminated as a result.

McMahan forwarded that recommendation to the BNSF Labor Relations Department and Igoe. The Labor Relations Department reviewed the evidence, agreed with McMahan, and recommended to Igoe that Armstrong be terminated. Igoe relied on those recommendations and decided to terminate Armstrong. BNSF notified Armstrong of his dismissal on

April 5, 2011, citing insubordination, dishonesty, and misrepresenting the origin of his injury as the causes of his termination.

Shortly thereafter, Armstrong filed a complaint with the Occupational Safety and Health Administration, and then a complaint in federal court, alleging that BNSF dismissed him for reporting a work-related injury, in violation of 49 U.S.C. § 20109(a)(4). The case proceeded to trial in January 2016, and ended in a mistrial due to the jury's failure to reach a unanimous verdict.

The case was retried in September 2016. On September 21, 2016, after a nine-day trial, the jury returned a verdict in favor of BNSF. The verdict form presented the jury with two questions. The first asked the jury whether Armstrong had proved his prima facie case, setting forth each of the required elements, to which the jury responded "No." It then asked, if Armstrong had proved his case, whether BNSF had proved that it would have taken the same action absent Armstrong's protected behavior. Though the jury technically did not need to respond after answering the first in the negative, they responded "Yes" to the second question. The district court noted that discrepancy, but stated that it did not find the two responses to be contradictory. The clerk entered the judgment the same day, which also included costs in favor of BNSF. Armstrong timely appealed.

## II.  DISCUSSION

Armstrong raises two issues on appeal. First, he contends that an erroneous jury instruction ("Instruction No. 24") entitles him to a new trial. Second, he argues that the district court erred in awarding costs to BNSF.

### A. Honest Belief Jury Instruction

"We review a district court's decisions on jury instructions for an abuse of discretion." *Brown v. Smith*, 827 F.3d 609, 614 (7th Cir. 2016). Even if we find an abuse of discretion, a new trial is warranted only where "an instruction misstates the law in a way that misguides the jury to the extent that the complaining party suffered prejudice." *Id.*

Armstrong's suit is based on a claim of unlawful retaliation in violation of § 20109(a)(4) of the FRSA. That section prohibits railroad carriers from discharging, or otherwise discriminating against an employee, "if such discrimination is due, in whole or in part, to the employee's lawful, good faith act done … to notify, or attempt to notify, the railroad carrier … of a work-related personal injury … ." 49 U.S.C. § 20109(a)(4). To make a prima facie showing of unlawful retaliation in this specific context, an employee must show that: (1) he made an injury complaint in good faith (i.e., engaged in a protected activity); (2) the rail carrier knew of the complaint; (3) he suffered an adverse employment action; and (4) the complaint was a contributing factor in the adverse action. *See id.* § 20109(d)(2)(A) (incorporating by reference the rules and procedures, including the burdens of proof, applicable to enforcement actions under 49 U.S.C. § 42121(b)); *see also* 29 C.F.R. § 1982.104(e)(2). Once that showing is made, the rail carrier can still escape liability if it can show, by clear and convincing evidence, that it would have taken the same action absent the protected activity. 49 U.S.C. § 42121(b)(2)(ii); 29 C.F.R. § 1982.104(e)(4).

On appeal, Armstrong seeks review of Instruction No. 24, which stated as follows:

> In deciding Plaintiff's retaliation claim, you should not concern yourselves with whether the Defendant's actions were wise, reasonable, or fair. Plaintiff has to prove that Defendant's decision to dismiss him was based on unlawful retaliation.

> Defendant cannot be held liable under the FRSA if you conclude that Defendant terminated Plaintiff's employment based on its honestly held belief that Plaintiff did not engage in protected activity under the FRSA in good faith.

He argues that Instruction No. 24 misstates the law insofar as it implies that he was required to prove that BNSF had an improper retaliatory motive, as opposed to simply showing that his complaint was a "contributing factor" in his discharge. Armstrong urges us to conclude that he is not required to prove a retaliatory motive under the FRSA statutory scheme. As support, he cites to a Third Circuit decision, which states that a FRSA plaintiff "*need not* demonstrate the existence of a retaliatory motive on the part of the employee taking the alleged prohibited personnel action in order to establish that his disclosure was a contributing factor to the personnel action." *Araujo v. N.J. Transit Rail Operations, Inc.*, 708 F.3d 152, 158 (3d Cir. 2013) (quoting *Marano v. Dep't of Justice*, 2 F.3d 1137, 1141 (Fed. Cir. 1993)).

Despite Armstrong's assertions to the contrary, we find that while a FRSA plaintiff need not show that retaliation was the *sole* motivating factor in the adverse decision, the statutory text

requires a showing that retaliation was *a* motivating factor. The
statute prohibits intentional discrimination in response to an
employee's performance of a protected activity. *See* 49 U.S.C.
§ 20109(a) (a railroad carrier "may not discharge, demote,
suspend, reprimand, or in any other way *discriminate* against
an employee") (emphasis added). "[T]he essence of this
intentional tort is discriminatory animus." *Kuduk v. BNSF Ry.
Co.*, 768 F.3d 786, 791 (8th Cir. 2014) (internal quotation marks
and citation omitted). That is to say, an employer violates the
statute only if the adverse employment action is, at some level,
*motivated* by discriminatory animus.

It is true that to make a prima facie case, a plaintiff is not
required to conclusively demonstrate that retaliation was the
only—or even main—motivation. *Id.* (citing *Coppinger-Martin
v. Solis*, 627 F.3d 745, 750 (9th Cir. 2010)). That does not mean,
however, that a plaintiff is not required to show that retaliation
played at least some role in the decision. *Id.* (noting that
"contributing factor" is a more lenient standard, but explaining
that "the contributing factor that an employee must prove is
intentional retaliation prompted by the employee engaging in
a protected activity"). A showing of discriminatory animus,
which the statute requires, necessarily includes some proof of
retaliatory motive.[1]

---

[1]  We agree with the Eighth Circuit's assessment that the Third Circuit's
reliance on *Marano v. Department of Justice* as a basis for deciding *Araujo*, 708
F.3d at 158, may have been misplaced. The whistleblower statute at issue in
*Marano* requires only a showing of causation in fact, *see* 2 F.3d at 1140–41,
and not a showing of discrimination as required by the FRSA. *See Kuduk*,
768 F.3d at 791 n.4.

Armstrong contends that because the FRSA requires only that he show the protected activity was a contributing factor in the adverse decision, he is not required to provide any proof of an employer's retaliatory motive. He is correct that the "contributing factor" standard is lower than those applied in other anti-discrimination contexts. *See, e.g.*, *Addis v. Dep't of Labor*, 575 F.3d 688, 691 (7th Cir. 2009) (explaining that "a 'contributing factor' is something less than a substantial or motivating one" as is required in typical employment discrimination actions). However, "contributing factor" is merely a standard of causation, and it does not eliminate the need to demonstrate the existence of an improper motive. *See Kuduk*, 768 F.3d at 791. The analysis of whether the employer possessed an improper (i.e., retaliatory) motive is separate from the analysis of whether, and to what extent, that motive influenced the employer's actions.

Turning then to Instruction No. 24 itself, we find that it accurately conveyed these principles. The instruction states that BNSF could not be liable if its decision was based on its honest belief that Armstrong did not make a complaint in good faith. That is simply another way of saying that BNSF could not be liable if it was not motivated by retaliation. If BNSF fired Armstrong because it honestly believed that he was lying about his complaint, then it necessarily follows that it did not retaliate against Armstrong for filing a good faith complaint. While the instruction may not have represented the clearest possible statement of the applicable law, it was not inaccurate. Therefore, the district court did not abuse its discretion by including the instruction.

Though we find that Instruction No. 24 was an appropriate and accurate statement of the law, it is important to highlight, as a final point, that any error would have been harmless. In addition to rejecting Armstrong's prima facie case, the jury found for BNSF on its affirmative defense that it would have taken the same action absent any protected activity. It is true that, technically speaking, the jury was not required to deliver a verdict on the affirmative defense, having first found that Armstrong failed to make a prima facie showing. However, there is no inherent inconsistency in the jury's responses to those two inquiries. Regardless of whether it is characterized as a rejection of Armstrong's case, or an acceptance of BNSF's defense, it was clearly a defense verdict. Thus, even if Instruction No. 24 was a misstatement of the law, Armstrong was not prejudiced.

### B.  Award of Costs

Armstrong's other argument on appeal is that the district court erred in awarding costs to BNSF because the FRSA does not allow for an award of costs to prevailing employers. "District courts have broad discretion in determining whether and to what extent prevailing parties may be awarded costs," and we will only reverse if there is a clear abuse of that discretion. *Weeks v. Samsung Heavy Indus. Co.*, 126 F.3d 926, 945 (7th Cir. 1997).

Our starting point for analyzing an award of costs is Federal Rule of Civil Procedure 54(d). That Rule provides, "[u]nless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1). The

presumption created by Rule 54(d) in favor of awarding costs is difficult to overcome. *Weeks*, 126 F.3d at 945; *see also Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 377 (2013) ("Rule 54(d) codifies a venerable presumption that prevailing parties are entitled to costs.").

In *Marx*, the Supreme Court made clear that a district court's discretion to award costs under Rule 54(d) can be displaced only by a federal statute that is contrary to the Rule. *Marx*, 568 U.S. at 377. A statute is contrary to the Rule if, for example, it precludes an award of costs altogether, or if it limits the circumstances under which the court may award costs, thereby removing its discretion. *Id.* at 377–78.

The FRSA provides that an employee who prevails in an action against his employer is entitled to receive litigation costs as part of his recovery. 49 U.S.C. § 20109(e)(2)(C). The statute, however, is silent as to awarding costs to a prevailing employer. According to Armstrong, this indicates that *only* prevailing employees are entitled to costs, and that the statute's silence precludes prevailing employers from recovering costs, even under Rule 54(d).

We disagree. The FRSA presents us with a situation similar to that which was before the Court in *Marx*. In addressing the cost award provisions of the Fair Debt Collection Practices Act, the Court stated that where a statute is silent, it "does not displace the background rule that a court has discretion to award costs." *Marx*, 568 U.S. at 380.

Armstrong argues that by specifying that a court must award costs to prevailing employees, Congress intended to preclude cost awards in all other situations. However, the

*Marx* Court heard and rejected a nearly identical argument. *Id.* at 380–81. The FRSA's silence on cost awards to prevailing employers, even in conjunction with its mandate regarding prevailing employees, is insufficient to overcome the "venerable presumption that prevailing parties are entitled to costs." *Id.* at 377; *see also Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 915 (7th Cir. 2013) (citing *Marx* for the proposition that "a statute 'provides otherwise' for purposes of Rule 54(d) only if it is literally contrary to the rule, in the sense that it constricts discretion that the rule recognizes"). Therefore, the district court did not abuse its discretion by awarding costs to BNSF.

### III. CONCLUSION

For the foregoing reasons, the jury verdict and award of costs in favor of BNSF are AFFIRMED.