# United States Court of Appeals
## For the Eighth Circuit

_____

No. 24-3135

_____

John C. Baldwin

*Plaintiff - Appellant*

v.

Union Pacific Railroad Co.

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: June 10, 2025
Filed: August 1, 2025

_____

Before LOKEN, ERICKSON, and KOBES, Circuit Judges.

_____

ERICKSON, Circuit Judge.

John Baldwin sued the Union Pacific Railroad Company ("Union Pacific") under the Americans with Disabilities Act ("ADA") and the Age Discrimination in Employment Act ("ADEA"), alleging he was unlawfully removed from his position following a fitness-for-duty evaluation. A jury found for Baldwin on his perceived disability claim but concluded he posed a direct threat to workplace safety. The

district court[1] entered judgment for Union Pacific and denied Baldwin's motion for a new trial. Baldwin appeals, challenging two jury instructions. We affirm.

## I.    BACKGROUND

John Baldwin joined the Union Pacific in 1997, working in Hermiston, Oregon. Initially, Baldwin was a diesel electrician and later, beginning in 2008, an electrician federal inspector. Baldwin suffered from degenerative arthritis in his hip and in 2010, he underwent a double hip replacement. Following his surgery, he had intermittent bursitis that limited his mobility. Baldwin was subject to flare-ups that he managed with his medical leave.

On June 28, 2016, when Baldwin was working on a locomotive that had been sitting in the summer heat, he experienced a bursitis flare-up that caused him to limp. His supervisor, Derek Spencer, suspected Baldwin was suffering from heatstroke and notified Union Pacific's Director of Locomotive Operations. The director offered Baldwin a referral for a fitness-for-duty evaluation through Union Pacific's Health and Medical Services department. Baldwin declined the referral and walked away. Spencer later observed Baldwin struggling to walk. The following day, the Director of Locomotive Operations submitted a manager-initiated fitness-for-duty request form, prompting Union Pacific to remove Baldwin from service pending a medical review.

Over the following months, Baldwin completed several medical evaluations. On July 8, 2016, his treating orthopedic surgeon, Dr. David Fischer, examined Baldwin's most recent x-rays and orthopedically cleared him to return to work without restrictions. On July 13, 2016, Dr. James Fulper, retained by Union Pacific, conducted a physical exam and reported no signs of acute distress. He recommended no work restrictions. Dr. Richard Lewis, Union Pacific's Associate Medical

---

[1]The Honorable Joseph F. Bataillon, United States District Judge for the District of Nebraska.

Director, reviewed Dr. Fulper's findings and agreed Baldwin was fit to return to duty.

Chief Medical Officer Dr. John Holland ordered an exercise tolerance test ("ETT") on July 28, 2016. Dr. Holland explained that Union Pacific used a minimum exertion threshold of 10 metabolic equivalents ("METs") for safety-sensitive positions like Baldwin's—a measure of aerobic capacity that reflects the energy cost of physical activities. Baldwin only achieved 7.0 METs and his results showed mild hypertension, but no cardiac ischemia. Dr. Holland interpreted the results as evidence of underlying cardiac disease and concluded Baldwin posed a direct threat to workplace safety.

On August 23, 2016, Baldwin completed a functional capacity evaluation ("FCE") that tested his ability to meet the physical demands of his job. A physical therapist concluded Baldwin could perform heavy work. On August 26, 2016, Dr. Holland imposed temporary work restrictions despite the FCE results. He cited Baldwin's low aerobic capacity, elevated blood pressure, and obesity, and restricted him from operating cranes or vehicles, working around moving trains, or climbing to unprotected heights. Lacey Kavan, Senior Director of Operations Support, reviewed the restrictions and determined they could not be accommodated.

At Baldwin's request, Dr. Holland issued a revised memorandum on October 20, 2016. He allowed for a second ETT and modified the restrictions, removing the crane operation restriction but adding others, including limits on high-heat environments and a restriction to light-duty exertion. Kavan reviewed the revised restrictions and again found them incompatible with Baldwin's role.

Baldwin took the second ETT on November 22, 2016. The test showed a slight improvement in aerobic capacity (8.1 METs) and no diagnostic evidence of ischemic heart disease. The supervising cardiologist noted myocardial wall stress and hypertension, recommending further evaluation. Dr. Holland reviewed the

results but did not order additional testing. Instead, he made the restrictions permanent.

On December 1, 2016, Union Pacific requested a record review from Dr. Brian Lowes, a heart failure specialist at the University of Nebraska. Dr. Lowes reviewed both ETTs and Dr. Holland's memo. He concluded Baldwin's exercise capacity was below average for his age and inadequate for his job duties without excessive fatigue. Although he found Baldwin's risk of sudden incapacitation "likely not significantly elevated," he noted extreme environmental conditions would increase his cardiovascular risk. He recommended sedentary work in a controlled indoor setting. Union Pacific maintained the existing restrictions, preventing Baldwin from returning to his job.

During this evaluation period, Baldwin filed a union grievance. A Public Law Board ruled in May 2018 that Baldwin should be examined by another physician. On July 24, 2018, Dr. James Harris, an occupational medicine specialist, examined Baldwin and found no medical reason to bar his return to work. Dr. Holland reviewed the report but upheld the work restrictions. Baldwin never returned to work.

In March 2022, Baldwin sued Union Pacific under the ADA, asserting claims for disparate treatment, disparate impact, and failure to accommodate. He also alleged age discrimination under the ADEA. The district court denied both parties' summary judgment motions. Because Baldwin then voluntarily dismissed the disparate impact and ADEA claims, the case proceeded to trial only on the disparate treatment and failure to accommodate ADA claims.

At trial, Baldwin argued Union Pacific's restrictions lacked objective medical support. Baldwin called two expert witnesses, Dr. Kevin Trangle, an occupational and environmental medicine doctor, and James Mills, a forensic economist. Dr. Trangle disagreed with Union Pacific's conclusion that Baldwin's exercise tolerance test results reflected a meaningful risk of sudden incapacitation. He testified that

-4-

Baldwin's aerobic capacity was sufficient for heavy work, and that a hypertensive response to exercise was "not a rare finding" indicative of cardiac disease or immediate risk. Dr. Trangle emphasized that neither of Baldwin's ETTs revealed any cardiac ischemia, and both were completed without incident. Mills calculated Baldwin's damages at $817,233.

Union Pacific argued that Baldwin posed a direct threat to himself. Dr. Holland explained to the jury the basis for the 10-MET exertion benchmark and his concerns about Baldwin's elevated blood pressure and reduced aerobic capacity. Dr. Lowes agreed Baldwin's exercise capacity was abnormal and recommended limiting him to sedentary work.

The district court instructed the jury using the Eighth Circuit's pattern instruction on the "direct threat" defense, which permits an employer to exclude an individual from a position if he poses a significant risk of substantial harm to himself or others that cannot be eliminated by reasonable accommodation. At Union Pacific's request, the court also gave the pattern "business judgment" instruction, which informed the jurors that they could not find for Baldwin merely because they believed Union Pacific's decision was harsh or unreasonable.

The jury found Union Pacific had discriminated against Baldwin based on a perceived disability but concluded he posed a direct threat to himself. The district court entered judgment for Union Pacific. Baldwin moved for a new trial, contending, among other things, the jury instructions misallocated the burden of proof, omitted critical elements of the direct threat defense, and misstated the law in the business judgment instruction. The district court denied the motion. This appeal followed.

## II. DISCUSSION

We review a district court's jury instructions for abuse of discretion. McCoy v. Augusta Fiberglass Coatings, Inc., 593 F.3d 737, 744 (8th Cir. 2010). A district

court enjoys "broad discretion in instructing the jury, and jury instructions do not need to be technically perfect or even a model of clarity." Id. (quoting Brown v. Sandals Resorts Int'l, 284 F.3d 949, 953 (8th Cir. 2002)). We will reverse only if an erroneous instruction affected a party's substantial rights. Slidell, Inc. v. Millennium Inorganic Chems., Inc., 460 F.3d 1047, 1054 (8th Cir. 2006). A new trial is warranted only if the instructions, taken as a whole, misled the jury or had a probable effect on the verdict. Id.; see United States v. Schrader, 10 F.3d 1345, 1350 (8th Cir. 1993) (considering both the instructions and closing arguments in evaluating whether the jury was properly advised on the burden of proof).

### A. *Direct Threat Instruction*

The district court gave the following pattern instruction on Union Pacific direct threat defense:

**INSTRUCTION NO. 29**
**DIRECT THREAT DEFENSE: ELEMENTS**

Your verdict must be in favor of defendant Union Pacific and against plaintiff John Baldwin if it has been proved that:

First, the defendant placed work restrictions on the plaintiff and did not allow him to return to his job because the plaintiff posed a direct threat to the health or safety of himself or others in the workplace; and

Second, such direct threat could not be eliminated by reasonable accommodation.

A direct threat means a significant risk of substantial harm to the health or safety of the person or other persons that cannot be eliminated by reasonable accommodation. The determination that a direct threat exists must be based on an individualized assessment of the plaintiff's present ability to safely perform the essential functions of the job.

In determining whether a person poses a direct threat, you must consider: (1) the duration of the risk; (2) the nature and severity of the

-6-

potential harm; (3) the likelihood that the potential harm will occur; and (4) the likely time before the potential harm occurs.

Baldwin asserts this instruction was deficient for two reasons: (1) it shifted the burden onto him to disprove he presented a significant risk of harm and (2) it omitted essential elements of the direct threat standard. We address each in turn.

### 1. Burden Shifting

Baldwin contends that the district court's direct threat instruction improperly shifted the burden of proof by employing the passive phrase "if it has been proved" to describe Union Pacific's affirmative defense. He asserts this phrasing may have led the jury to conclude he bore the burden of disproving that he posed a direct threat, contrary to the established framework under which the employer must prove the defense. See EEOC v. Wal-Mart Stores, Inc., 477 F.3d 561, 571 (8th Cir. 2007) (establishing that the employer bears the burden of proving the employee posed a direct threat).

Baldwin primarily relies on Am. Eagle Ins. Co. v. Thompson, 85 F.3d 327 (8th Cir. 1996), where this Court vacated the judgment and remanded for a new trial because the instructions failed to "explicitly state that the burden of proof was on American Eagle [to prove that Thompson was an employee]." Id. at 330 n.2. But in Thompson, the Court also recognized the jury was repeatedly told during trial that American Eagle bore the burden and was never instructed otherwise. Id. Here, the instruction was explicitly labeled as a "defense," the verdict form referred to "Union Pacific's defense of direct threat," and Baldwin's counsel told the jury that Union Pacific bore the burden. Taken together, these statements adequately conveyed the applicable legal standard. The use of passive phrasing, while not ideal, did not mislead the jury and reversal on this basis is not warranted. See Chicago, Rock Island & Pac. R.R. Co. v. Emery, 233 F.2d 848, 850 (8th Cir. 1956) ("[R]efusal to amplify that which is clearly implicit in the court's instructions does not constitute reversible error.").

## 2. Missing Elements

Baldwin also contends the jury instructions omitted essential elements of the regulatory standard governing the direct threat defense. When a party disputes the elements of the court's instruction, "[o]ur inquiry is whether the court's charge as a whole fairly and adequately instructed the jury as to the applicable law." Mississippi Lofts, Inc. v. Lexington Ins. Co., of Wilmington, Del., 841 F.2d 251, 254 (8th Cir. 1988).

The ADA regulation on the affirmative defense of direct threat defines "direct threat" as follows:

> (r) Direct Threat means a significant risk of substantial harm to the health or safety of the individual or others that cannot be *eliminated or reduced* by reasonable accommodation. The determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. *This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence.* In determining whether an individual would pose a direct threat, the factors to be considered include:
> (1) The duration of the risk;
> (2) The nature and severity of the potential harm;
> (3) The likelihood that the potential harm will occur; and
> (4) The imminence of the potential harm.

29 C.F.R. § 1630.2 (emphases added); see Chevron U.S.A. Inc. v. Echazabal, 536 U.S. 73, 78, 86 (2002) (discussing the "direct threat" standard and citing § 1630.2).

Baldwin contends the district court's instruction improperly omitted two elements of the regulatory definition: (1) the requirement that the risk cannot be "eliminated or reduced" by reasonable accommodation, and (2) the requirement that the determination be based on "a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence." 29

C.F.R. § 1630.2(r); Sanders v. Union Pac. R.R. Co., 108 F.4th 1055, 1062 (8th Cir. 2024) ("To establish the [direct threat] defense, Union Pacific was required to show that its determination that Sanders posed a direct threat was: (1) the result of an individualized assessment, (2) objectively reasonable, and (3) based on the 'most current medical knowledge and/or on the best available objective evidence.'"). These omissions, Baldwin asserts, reduced Union Pacific's burden and misstated the governing legal standard.

Baldwin likens his case to Blackorby v. BNSF Ry. Co., in which this Court reversed and remanded for a new trial after concluding a challenged jury instruction "did not fairly and adequately represent the law in this Circuit." 849 F.3d 716, 721–22 (8th Cir. 2017) (citation modified) ("Blackorby I"). On appeal, Baldwin argues the regulation plainly requires consideration of whether a threat can be reduced through accommodation and mandates that any threat determination be grounded in objective medical judgment. He further contends the failure to include either element rendered the instruction materially incomplete.

While it is true that "[t]he brevity or conciseness of a correct and adequate charge to a jury . . . does not constitute reversible error," Chicago, Rock Island & Pac. R.R. Co., 233 F.2d at 850, the instructions must still fairly and adequately submit the issues to the jury. McCoy, 593 F.3d at 744. Here, the direct threat instruction did not fully reflect the law as prescribed by the governing regulation and our precedent. Union Pacific responds that any error was cured by a different instruction on the statement of the case, which stated Union Pacific "contends that the plaintiff's medical condition posed a significant risk to his or to others' health and/or safety that could not have been eliminated *or reduced* by a reasonable accommodation" (emphasis added). Rather than resolve the issue, however, this only reiterates the "eliminated or reduced" language was essential to a complete formulation of the instruction. Moreover, it did not require the jury to find that Union Pacific's threat determination relied on objective medical evidence or current medical knowledge. The district court's instruction, therefore, did not meaningfully restore the full scope of the employer's burden under our standards.

-9-

While the direct threat instruction was erroneous, we conclude the omission did not affect the outcome of the trial. See Williams v. Baum, 48 F.4th 571, 574 (8th Cir. 2022). The central dispute at trial was whether Union Pacific's fitness-for-duty decision rested on an objective, evidence-based medical judgment. Baldwin's counsel raised this issue in his opening statement, asserting that "every objective medical test and every objective medical opinion" supported Baldwin's return to work, but Union Pacific "simply wouldn't listen." Union Pacific's Chief Medical Officer, Dr. Holland, testified that Baldwin failed to meet the 10-MET threshold Union Pacific applied to safety-sensitive positions and explained that Baldwin's elevated blood pressure and reduced aerobic capacity raised concerns about sudden incapacitation. He cited occupational medicine literature to support the 10-MET benchmark. On cross-examination, Baldwin's counsel challenged the validity of that standard and whether it reflected the demands of Baldwin's specific role.

Baldwin's expert, Dr. Trangle, testified that a hypertensive response to exercise was not uncommon and, standing alone, did not indicate a heightened cardiac risk. He also questioned the reliability of the exercise tolerance test as a stand-alone diagnostic tool, noting its limitations in predicting actual workplace performance. Dr. Trangle outlined various physical tasks associated with different MET levels and testified that Baldwin's position could be safely performed at the MET level he achieved. The parties successfully presented conflicting expert opinions on whether Baldwin's condition posed a safety threat, creating a question for the jury to resolve. Considering all the evidence, the jury found for Union Pacific. The incomplete jury instruction did not affect the outcome of the trial.

## B.     Business Judgment Instruction

Baldwin separately argues the court's use of the pattern "business judgment" instruction compounded the error by implying Union Pacific could prevail on its direct threat defense even if its decision was unreasonable. The instruction, drawn from the Eighth Circuit's pattern instructions, stated: "You may not return a verdict

for the plaintiff just because you might disagree with the defendant's decision or believe it to be harsh or unreasonable."

According to Baldwin, the instruction conflicted with Union Pacific's burden under the direct threat defense, which requires an "objectively reasonable" risk assessment grounded in medical evidence. Sanders, 108 F.4th at 1062; 29 C.F.R. § 1630.2(r). Baldwin argues that, by suggesting Union Pacific could make an "unreasonable" decision and still avoid liability, the instruction undermined the ADA's requirement that employers base direct threat determinations on objective medical judgment. He proposed a narrower instruction, which read: "You may not return a verdict for the plaintiff just because you might disagree with the defendant's decision. To find for the plaintiff, you must find that the defendant violated the ADA." Baldwin contends the district court abused its discretion when it declined to adopt that language.

Baldwin principally relies on Blackorby v. BNSF Ry. Co., 936 F.3d 733, 737–40 (8th Cir. 2019) ("Blackorby II"), where this Court reversed a jury verdict because the district court's "honestly held belief" instruction directly contradicted the governing legal standard and altered the burden of proof under the Federal Railroad Safety Act. But the business judgment instruction at issue in this case did not purport to define the elements of the direct threat defense, nor did it stand alone. Instead, it served as a limiting principle, cautioning the jury against inserting its own view of what constituted a valid employment decision for the legal standards set forth in the other instructions.

As we explained in Stemmons v. Mo. Dep't. of Corrections, 82 F.3d 817, 819 (8th Cir. 1996), a district court "must offer" a business judgment instruction when one is requested in a discrimination case. While a party is not entitled to insist on any specific formulation, Union Pacific's proposed instruction adequately captured the relevant law. See id. (citing Blake v. J.C. Penney Co., 894 F.2d 274, 282 (8th Cir. 1990)). Viewed in the context of the instructions as a whole, the business judgment instruction did not misstate the law or mislead the jury. That the jury

-11-

returned a split verdict further suggests it understood and applied the different standards at issue. Baldwin's objection ultimately reflects a preference for different phrasing, but that alone does not amount to an abuse of discretion. <u>See</u> <u>McCoy</u>, 593 F.3d at 744.

## III.  CONCLUSION

We affirm the judgment of the district court.

_____